Kenneth P. PRILL, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 84–1064.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 19, 1984.

Decided Feb. 26, 1985.

As Amended Feb. 26, 1985.

Bork, Circuit Judge, dissented and filed opinion.

Ellis Boal, Detroit, Mich., for petitioner.

David Fleischer, Atty. N.L.R.B., Washington, D.C., with whom Wilford W. Johansen, Acting General Counsel and Elliott Moore, Deputy Associate General Counsel, N.L.R.B., Washington, D.C., were on brief, for respondent.

Ira Jay Katz, Philadelphia, Pa., was on brief for Workers' Rights Law Project, et al., amicus curiae, urging reversal.

Before WALD, EDWARDS, and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Dissenting opinion filed by Circuit Judge BORK.

HARRY T. EDWARDS, Circuit Judge:

### I. PROLOGUE

On this petition for review, we consider a case in which the petitioner, Kenneth Prill,

was discharged from his job at Meyers Industries, Inc. ("Meyers"), because he complained about the unsafe condition of a company truck and trailer, including a complaint to state authorities following an accident, and because he refused, for safety reasons, to continue driving the truck and trailer following the accident. An investigation by state officials determined that the company vehicle was in fact unsafe due to faulty brakes and a damaged hitch, and a citation was issued against Meyers. Notwithstanding the concededly unsafe condition of the vehicle, Prill was fired because company officials decided that they could not have him "calling the cops all the time."

In protest against his discharge, Prill filed an unfair labor practice charge with the National Labor Relations Board ("NLRB" or "Board"), and a complaint was issued against Meyers. An Administrative Law Judge ("ALJ"), following existing Board precedent, found that Prill's conduct constituted "concerted activit[y] for ... mutual aid or protection" under section 7 of the National Labor Relations Act ("NLRA" or "Act"),[1] and recommended his full reinstatement. However, the Board, over the dissent of one member, reversed the decision of the ALJ, overruled its earlier decisions, and dismissed the complaint against Meyers.[2] In rejecting Prill's charge, the Board adopted a new definition of "concerted activities;" under the enunciated test, an employee's conduct is not "concerted" unless it is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself."[3] Finding that Prill had acted alone and "solely on his own behalf,"[4] the Board held his conduct unprotected by section 7.

It is not the responsibility of the courts to second-guess the lawful judgments of the NLRB. The Board has been granted broad authority to construe the NLRA in light of its expertise. In appropriate circumstances, the Board even may elect to abandon or modify established precedent. However, judicial deference is not accorded a decision of the NLRB when the Board acts pursuant to an erroneous view of law and, as a consequence, fails to exercise the discretion delegated to it by Congress.

In the instant case, we find that the Board erred when it decided that its new definition of "concerted activities" was *mandated* by the NLRA. Because the Board misconstrued the bounds of the law, its opinion stands on a faulty legal premise and without adequate rationale. Accordingly, we remand this case under the principles of *SEC v. Chenery Corp.*,[5] so that the Board may reconsider the scope of "concerted activities" under section 7. We express no opinion as to the correct test of "concerted activities;" we require only that the Board exercise the full measure of administrative discretion granted to it by Congress and reconsider this matter free from its erroneous conception of the bounds of the law.

1. NLRA § 7, 29 U.S.C. § 157 (1982), provides:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
 Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1) (1982), provides:

 It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

2. *Meyers Indus., Inc.*, 268 N.L.R.B. No. 73, 115 L.R.R.M. 1025 (Jan. 6, 1984) (hereinafter referred to as *"Meyers"*).

3. *Id.* at 12, 115 L.R.R.M. at 1029.

4. *Id.* at 16, 115 L.R.R.M. at 1030.

5. 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

## II. Background

### A. *Facts*

The facts were found by the Administrative Law Judge[6] and accepted by the Board,[7] and are largely undisputed on review. Kenneth Prill was hired as a skilled driver on April 24, 1979, by Meyers Industries, a Michigan company engaged in the manufacture, sale and distribution of aluminum boats and related products. Prill had driven trucks for several years before going to work for Meyers, and he had received two years of training as a mechanic. Throughout the period that he was employed by Meyers, he had a good work record.

Prill was assigned to drive a red Ford truck and its accompanying trailer to haul boats from Meyers' main facility in Tecumseh, Michigan, to dealers throughout the country. Prill soon began to experience problems with his equipment, especially with the steering and the trailer's brakes.[8] In addition to discussing these problems with other drivers,[9] Prill made numerous complaints to his supervisor, Dave Faling, to the company president, Alan Beatty, and to the mechanic, Buck Maynard, after returning from trips on which the brakes malfunctioned.

On one trip, for example, while he was driving through Chicago, Illinois, Prill narrowly escaped an accident when his brakes failed during a sudden stop in heavy traffic. On his return Prill asked Faling and Maynard to have the brakes repaired, but Maynard's efforts were unsuccessful. He told Prill that the axles were so old that it was impossible to secure replacement parts; Prill insisted that new parts be purchased. After his next trip, during which the brakes remained inoperative, Prill again asked Faling when the brakes would be repaired, but was simply referred to Maynard or Beatty.

On a subsequent trip to Xenia, Ohio, Prill stopped at a roadside inspection conducted by the Ohio State Highway Patrol. As a result of that inspection, the truck was issued a citation for a number of defects, including the brakes. When Prill returned to Michigan, he showed the citation to Faling and submitted it together with his post-trip paperwork.

During the first two weeks in June, 1979, another driver, Ben Gove, drove Prill's equipment on a trip to Sudberry, Ontario. Gove testified before the ALJ that he experienced a steering problem which made it difficult to hold the road and "caused [the truck] to swerve back and forth like Ken Prill described," nearly causing an accident.[10] When Gove went to Faling's office to submit his post-trip report, Prill was there at the same time to receive paperwork for the next trip. Gove described the steering and brake problems to Faling, and stated, in Prill's presence, that he would not drive the truck again until it was repaired.[11] Faling promised to make the needed repairs.

In early July, Prill was driving through Athens, Tennessee, when he had an accident which the Board found was caused by the malfunctioning brakes.[12] A pickup

---

6. *Meyers Indus., Inc.*, Case 7–CA–17207, slip op. at 2–5 (Jan. 14, 1981), *reprinted in* Joint Appendix ("J.A.") 280, 281–84 (hereinafter referred to as "ALJ Decision").

7. *Meyers* at 1–2, 13–15, 115 L.R.R.M. at 1029–30.

8. As Prill explained in his testimony before the ALJ, his vehicle was equipped with braking systems on both the truck and the trailer components. These systems, although they can be operated independently, ordinarily would function together when the brake pedal is depressed. On the vehicle assigned to Prill, however, the brakes on the trailer were essentially inoperative. *See* Transcript of Hearing (Aug. 1, 1980) ("Tr.") at 16–17, J.A. 40–41.

9. *See* Tr. at 18, J.A. 42.

10. Tr. at 62, J.A. 86.

11. Gove testified at the hearing that he told Faling, "I wouldn't take the truck as far as Clinton and back, until ... someone reapired [sic] it. I didn't care who done it, but I wasn't going to drive it no further." Tr. at 63, J.A. 87. In its brief, the Board reads this statement to mean that Gove did not care who drove the truck. Brief for NLRB at 3. We agree with the petitioner, Reply Brief of Petitioner at 1–2, that the more natural reading of Gove's statement is that he did not care who repaired the truck so long as repairs were made.

12. *Meyers* at 14, 115 L.R.R.M. at 1029.

truck struck the left rear of Prill's trailer, causing the truck to jack-knife and sending both vehicles into a ditch.[13] After giving a statement to the state highway patrol at the scene of the accident, Prill unsuccessfully sought to have the truck and trailer inspected by the state public service commission.[14]

Following the accident, Prill called Meyers' president Alan Beatty at home to advise him of the incident and of the extensive damage to the unit. Beatty asked Prill to chain the tractor and trailer together and tow the trailer back to Tecumseh for repairs. Prill responded that "it would be possible to do that, but it would still be a hazard on the highway" because the hitch area was cracked and might give way and cause an accident.[15] Beatty repeated that Prill should chain and tow the trailer home, but told him that if he insisted he could have a mechanic in Tennessee look at it.

The following morning, Prill called Beatty at work and spoke to him and to Wayne Seagraves, the company's vice president for production. Both were upset that Prill was still in Tennessee, and demanded to know why he had not yet left. Prill stated that the vehicle was unsafe because the hitch was damaged and the trailer lacked brakes. Seagraves responded that the company had been running its trucks like

that for 20 years.[16] At the end of the conversation, Beatty and Seagraves decided to send Maynard down to check the equipment.

After this conversation, Prill decided to contact the Tennessee Public Service Commission to arrange for an official inspection of the vehicle. The inspection resulted in a citation putting the unit out of service because of bad brakes and damage to the hitch area. The citation was based on several Department of Transportation regulations, including 49 C.F.R. § 396.4, which prohibited the operation of an unsafe vehicle.[17] Prill was instructed to notify the police or Public Service Commission immediately if anyone attempted to move the vehicle before required repairs were made. When Maynard arrived in Tennessee later the same day, Prill showed him the citation. Maynard and Beatty then decided that the trailer was not worth repairing and should be sold for scrap after removing the tires.

Two days later Prill reported for work and was summoned to Wayne Seagraves' office, where he was questioned about the accident and damage to the truck. Both Seagraves and Beatty asked Prill why he had not towed the trailer back as requested; Prill responded that this would have been both unsafe and unlawful.[18] At the

---

**13.** Meyers conceded before the agency that the accident was not Prill's fault and that it was not a consideration in his discharge. ALJ Decision at 3, J.A. 282.

**14.** Tr. at 34–35, J.A. 58–59.

**15.** Tr. at 36, J.A. 60.

**16.** Tr. at 37, J.A. 61.

**17.** 49 C.F.R. § 396.4 (1978), the regulation in effect at the time of the events herein, provided as follows:

**Unsafe operations forbidden.**

No motor carrier shall permit or require a driver to drive any motor vehicle revealed by inspection or operation to be in such condition that its operation would be hazardous or likely to result in a breakdown of the vehicle nor shall any driver drive any motor vehicle which by reason of its mechanical condition is so imminently hazardous to operate as to be likely to cause an accident or a breakdown of the vehicle. If while any motor vehicle is

being operated on a highway, it is discovered to be in such unsafe condition, it shall be continued in operation only to the nearest place where repairs can safely be effected, and even such operations shall be conducted only if it be less hazardous to the public than permitting the vehicle to remain on the highway.

**18.** Prill testified that he told Seagraves "that the law requires that all vehicles that are involved in an accident be inspected by either a state authority or a certified mechanic of somekind [sic] before they are moved or put back on the highway." Tr. at 54, J.A. 78. Prill testified that in this conversation he was relying on § 396.6 of the Federal Motor Carrier Safety Regulations, which were contained in a manual for truck drivers published by the Federal Highway Administration, U.S. Department of Transportation. The section provided as follows:

**Damaged vehicles, inspection.**

No motor carrier shall permit or require a driver to drive nor shall any driver drive a

end of the conversation, Seagraves told Prill that he was discharged because "we can't have you calling the cops like this all the time." [19]

### B. *The Decisions of the ALJ and the Board*

On the basis of these facts, the ALJ found that Prill was discharged because of his safety complaints and his refusal to drive an unsafe vehicle in accordance with Department of Transportation regulations.[20] Relying on the rationale of *Alleluia Cushion Co.*,[21] the ALJ held that Prill's actions were "concerted activities for ... mutual aid or protection" under section 7 of the NLRA, and thus protected, because they inured to the benefit of all employees.[22] In order to understand this conclusion, it is necessary briefly to review the development of the Board's doctrine of "constructive concerted activity."

During the past 25 years, the Board has gradually extended the concept of "concerted activities" under section 7 to include certain types of actions taken by individual employees. For example, under the so-called *Interboro* doctrine, the Board has long held that the assertion by a single employee of rights derived from a collective bargaining agreement is protected under section 7, on the reasoning that such an act is an extension of the concerted action that produced the agreement and that it affects the rights of all employees covered by the agreement.[23] In addition, in a series of cases since 1959, the Board developed the position that section 7 protects complaints made by an individual, even absent authorization by other employees, "if the matter at issue is of moment to the group of employees complaining and if that matter is brought to the attention of management by a spokesman, voluntary or appointed for that purpose, so long as such person is speaking for the benefit of the interested group." [24]

In *Alleluia Cushion Co.*,[25] the Board extended the doctrine of constructive concerted activity to include an individual employee's efforts to invoke state and federal laws regulating occupational safety. In *Alleluia* an employee was discharged for notifying the California Occupational Safety and Health Administration (OSHA) of unsafe conditions at his plant. Observing that "[s]afe working conditions are matters of great and continuing concern for all within the workforce," and that filing the OSHA complaint "was an action taken in furtherance of guaranteeing Respondent's employees their rights under the California Occupational Safety and Health Act," the Board held that

> [i]t would be incongruous with the public policy enunciated in such occupational safety legislation ... to presume that, absent an outward manifestation of support, Henley's fellow employees did not agree with his efforts to secure compliance with the statutory obligations imposed on Respondent for their benefit. Rather, since minimum safe and healthful employment conditions for the protection and well-being of employees has

motor vehicle which has been damaged in an accident or by other cause until inspection has been made by a person qualified to ascertain the nature and extent of the damage and the relationship of such damage to the safe operation of the motor vehicle, nor shall such motor vehicle be operated until such person has determined it to be in safe operating condition.
49 C.F.R. § 396.6 (1978).

19. Tr. at 44, J.A. 68.

20. ALJ Decision at 8–9, J.A. 287–88.

21. 221 N.L.R.B. 999 (1975).

22. ALJ Decision at 9–10, J.A. 288–90.

23. See *Interboro Contractors, Inc.*, 157 N.L.R.B. 1295, 1298 (1966), *enforced*, 388 F.2d 495 (2d Cir.1967); *Bunney Bros. Constr. Co.*, 139 N.L.R.B. 1516, 1519 (1962).

24. *Carbet Corp.*, 191 N.L.R.B. 892, 892 (1971); *Hugh H. Wilson Corp.*, 171 N.L.R.B. 1040, 1046 (1968), *enforced*, 414 F.2d 1345 (3d Cir.1969), *cert. denied*, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970); *Guernsey-Muskingum Elec. Coop., Inc.*, 124 N.L.R.B. 618, 624 (1959), *enforced*, 285 F.2d 8 (6th Cir.1960).

25. 221 N.L.R.B. 999 (1975).

been legislatively declared to be in the overall public interest, the consent and concert of action emanates from the mere assertion of such statutory rights. Accordingly, where an employee speaks up and seeks to enforce statutory provisions relating to occupational safety designed for the benefit of all employees, in the absence of any evidence that fellow employees disavow such representation, we will find an implied consent thereto and deem such activity to be concerted.[26]

The rationale of *Alleluia* thus was composed of two stands: (1) the Board's familiar view that an individual's activity should be protected if it relates to a matter of "mutual concern" to employees, and (2) a more specific rationale that concert may be presumed when an individual asserts rights under a statute enacted for the benefit of employees.[27]

Applying the principles of *Alleluia* and its progeny,[28] the ALJ in the instant case held Prill's conduct protected under section 7. He reasoned that Prill's refusal to drive the vehicle was mandated by Department of Transportation regulations that reflected a concern for the safety of particular drivers as well as for that of the general al public, and that "[a]n employee who complains about the safety of a particular truck speaks for the safety of any employee who may drive that truck."[29] The ALJ also held that Prill's complaints prior to the accident "were clearly concerted because they were joined by driver Gove," who had made similar complaints to supervisor Dave Faling in Prill's presence.[30] Therefore, the ALJ ruled that Prill's discharge violated section 8(a)(1).

The Board disagreed and dismissed the complaint. Overruling *Alleluia* and its progeny, the Board argued that activity could be "concerted" only if it in fact involved "some kind of group action," and criticized *Alleluia* as inconsistent with the statute because it allowed group support to be presumed rather than proven.[31] Claiming to return to "the standard on which the Board and courts relied before *Alleluia*,"[32] the Board announced the following test for protected concerted activity:

In general, to find an employee's activity to be "concerted," we shall require that it be engaged in with or on the authority of other employees, and not solely by or on behalf of the employee himself. Once

---

**26.** *Id.* at 1000.

**27.** *See Meyers* at 20–21, 15 L.R.R.M. at 1031–32 (Member Zimmerman, dissenting); Gorman & Finkin, *The Individual and the Requirement of "Concert" Under the National Labor Relations Act,* 130 U.Pa.L.Rev. 286, 305 (1981).

In later cases, the Board extended the reasoning of *Alleluia* to protect the assertion of rights under other statutes, as well as to complaints over matters of mutual concern and to employee complaints made to the employer rather than to governmental agencies. *See, e.g., Krispy Kreme Doughnut Corp.,* 245 N.L.R.B. 1053 (1979), *enforcement denied,* 635 F.2d 304 (4th Cir.1980) (worker's compensation claim); *Steere Dairy, Inc.,* 237 N.L.R.B. 1350 (1978) (protest over pay and working conditions); *Self Cycle & Marine Distrib. Co.,* 237 N.L.R.B. 75 (1978) (unemployment compensation claim); *Air Surrey Corp.,* 229 N.L.R.B. 1064 (1977), *enforcement denied,* 601 F.2d 256 (6th Cir.1979) (inquiry concerning employer's ability to meet payroll); *Dawson Cabinet Co.,* 228 N.L.R.B. 290, *enforcement denied,* 566 F.2d 1079 (8th Cir.1977) (protest over failure to comply with Equal Pay Act).

While the *Alleluia* decision itself did not receive judicial review, the post-*Alleluia* decisions were generally rejected by the courts of appeals. *See, e.g., Ontario Knife Co. v. NLRB,* 637 F.2d 840 (2d Cir.1980); *Krispy Kreme, supra; Pelton Casteel, Inc. v. NLRB,* 627 F.2d 23 (7th Cir.1980); *NLRB v. Bighorn Beverage,* 614 F.2d 1238 (9th Cir.1980); *Dawson Cabinet Co., supra. But see, e.g., NLRB v. Lloyd A. Fry Roofing Co.,* 651 F.2d 442 (6th Cir.1981); *NLRB v. Ambulance Serv. of New Bedford, Inc.,* 564 F.2d 88 (1st Cir.), *enforcing mem.* 229 N.L.R.B. 106 (1977); *see also NLRB v. Parr Lance Ambulance Serv.,* 723 F.2d 575, 579–80 (7th Cir.1983). We discuss below, *see* note 72 *infra,* the relevance of these decisions to the instant case.

**28.** In particular, the ALJ relied on *Pink Moody, Inc.,* 237 N.L.R.B. 39 (1978), in which the Board found a violation of section 8(a)(1) on facts nearly identical to those in *Meyers.*

**29.** ALJ Decision at 9–10, J.A. 288–89.

**30.** *Id.* at 10, J.A. 289.

**31.** *Meyers* at 3, 8–10, 115 L.R.R.M. at 1026, 1027–28.

**32.** *Id.* at 11, 115 L.R.R.M. at 1029.

the activity is found to be concerted, an 8(a)(1) violation will be found if, in addition, the employer knew of the protected nature of the employee's activity, the concerted activity was protected by the Act, and the adverse employment action at issue (*e.g.*, discharge) was motivated by the employee's protected concerted activity.[33]

Applying this standard, the Board held that Prill had acted alone and "solely on his own behalf" when he refused to drive the truck and contacted the Tennessee Public Service Commission.[34] As to whether Prill's complaints prior to the accident were joined by Gove, the Board found that the record was clear that "Prill merely overheard Gove's complaint while in the office on another matter." [35] Stating that "the most that can be inferred from this scenario is that another employee was individually concerned ... about the truck's condition," the Board ruled that "[t]aken by itself, ... *individual* employee concern, even if openly manifested by several employees on an *individual* basis, is not sufficient evidence to prove concert of action." [36] Although the Board admitted to being "[o]utraged ... by a respondent who—at the expense of its driver and others traveling on the nation's highways—was clearly attempting to squeeze the last drop of life out of a trailer that had just as clearly given up the ghost," it nevertheless concluded that it did not believe "that section 7, framed as it was to legitimize and protect group action engaged in by employees for their mutual aid and protection, was intended to encompass the case of individual activity presented here." [37] Therefore, the Board held that Prill's discharge did not violate his rights under section 7.[38]

## III. ANALYSIS

### A. *Standard of Review*

 Because the Board is entrusted with the "responsibility to adapt the Act to changing patterns of industrial life," [39] a reasonable construction of the Act by the Board is entitled to considerable deference.[40] An agency decision cannot be sustained, however, where it is based not on the agency's own judgment but on an erroneous view of the law. For it is a fundamental principle of law that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." [41] As the Supreme Court stated in its landmark decision in *SEC v. Chenery Corp.*:

> [I]f [agency] action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law.... [T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be

---

**33.** *Id.* at 12, 115 L.R.R.M. at 1029 (footnotes omitted).

**34.** *Id.* at 16, 115 L.R.R.M. at 1030.

**35.** *Id.*

**36.** *Id.* at 17, 115 L.R.R.M. at 1030 (emphasis in original).

**37.** *Id.* at 18, 115 L.R.R.M. at 1031. The Board added, paraphrasing Chairman Miller's dissent in *G.V.R., Inc.*, 201 N.L.R.B. 147, 148 (1973), that it was "neither God nor the Department of Transportation," and that it was "not empowered to correct all immorality or even illegality arising under the total fabric of Federal and state laws." *Meyers* at 18, 115 L.R.R.M. at 1031.

**38.** One member of the Board dissented, arguing that the Board's "use [of] the concept of concert-ed activity to cut off protection for the individual employee who asserts collective rights" violated "the history and spirit of Federal labor laws." *Id.* at 20, 115 L.R.R.M. at 1031 (Member Zimmerman, dissenting).

**39.** *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975).

**40.** *See, e.g., NLRB v. City Disposal Sys., Inc.*, —— U.S. ——, 104 S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984); *Ford Motor Co. v. NLRB*, 441 U.S. 488, 495, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979).

**41.** *SEC v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("*Chenery*"); *see also SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

clearly disclosed and adequately sustained.[42]

These principles were concisely stated by Judge Bork in his separate opinion in *Planned Parenthood Federation of America, Inc. v. Heckler:* [43]

> Under *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), we must judge the validity of an administrative regulation solely on "the grounds upon which the [agency] itself based its action." *Id.* at 88, 63 S.Ct. at 459. In particular, an agency regulation must be declared invalid, even though the agency might be able to adopt the regulation in the exercise of its discretion, if it "was not based on the [agency's] own judgment but rather on the unjustified assumption that it was Congress' judgment that such [a regulation is] desirable." *FCC v. RCA Communications, Inc.*, 346 U.S. 86, 96, 73 S.Ct. 998, 1005, 97 L.Ed. 1470 (1953). If a regulation is based on an incorrect view of applicable law, the regulation cannot stand as promulgated, unless the "mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." *Massachusetts Trustees v. United States*, 377 U.S. 235, 248, 84 S.Ct. 1236, 1245, 12 L.Ed.2d 268 (1964).[44]

We think that the teachings of *Chenery* are plainly implicated in this case. The Board's opinion clearly reveals that it considered its adoption of a narrow test for "concerted activities" both to be mandated by the NLRA itself and to be merely a return to "the standard on which the Board and courts relied before *Alleluia*." [45] We believe that the Board misinterpreted the law in two respects. First, we think, especially on the basis of recent Supreme Court decisions, that the Board erred in assuming that the NLRA *mandates* its present interpretation of "concerted activities." In other words, the Board's opinion is wrong insofar as it holds that the agency is without discretion to construe "concerted activities" except as indicated in the *Meyers* test.[46] Second, contrary to the view expressed by the Board, we find that the *Meyers* test does not represent a return to the standard relied on by the courts and by the Board before *Alleluia*, but instead constitutes a new and more restrictive standard. We therefore conclude that, because the Board's decision stands on a faulty legal premise and without adequate rationale, we must remand the case for reconsideration.

## B. *The* Meyers *Test*

■ The Board announced in this case that, "[i]n general, to find an employee's activity to be 'concerted,' we shall require that it be engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." [47] As counsel for the Board confirmed at oral argument, this test in effect requires that two or more employees join in or authorize conduct before activity can be "concerted" under section 7.

The Board's decisions since *Meyers* indicate that the new definition will be strictly construed to include only activity clearly joined in or endorsed by other employees. Thus, to find that a complaint by an individual employee was made "on behalf of" others, the Board in effect will require that the complaint have been specifically autho-

---

**42.** 318 U.S. at 94, 63 S.Ct. at 462.

**43.** 712 F.2d 650 (D.C.Cir.1983).

**44.** *Id.* at 666 (Bork, J., concurring in part and dissenting in part); *see also FCC v. RCA Communications, Inc.*, 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); *White v. United States Dep't of the Army*, 720 F.2d 209, 210–11 (D.C.Cir. 1983); *The Diplomat Lakewood Inc. v. Harris*, 613 F.2d 1009, 1018–19 (D.C.Cir.1979). *See gen-*

*erally* Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders,* 1969 Duke L.J. 199.

**45.** *Meyers* at 11, 115 L.R.R.M. at 1029.

**46.** We express no view on whether, under § 7, the Board may adopt the *Meyers* test as an exercise of discretion.

**47.** *Meyers* at 12, 115 L.R.R.M. at 1029.

rized by other employees.[48] Further, a single employee who files a complaint with a state agency will not be held to have engaged in concerted activities, regardless of how clearly his concern is shared by other employees.[49]

The Board's opinion reveals that it believed its present construction of "concerted activities" both to be required by the NLRA and to be a return to standards used by the courts as well as by the Board itself before *Alleluia*. Although it conceded that "the legislative history of Section 7 does not specifically define 'concerted activity,'" the Board maintained that "it does reveal that Congress considered the concept in terms of individuals united in pursuit of a common goal."[50] The Board argued that a similar interpretation emerged from an analysis of the language of section 7.[51] The Board then reviewed its pre-*Alleluia* decisions to show that, "[c]onsistent with this interpretation," they had required "some sort of group action" to be present in order to find conduct to be concerted under section 7.[52] The opinion criticized *Alleluia* for deviating from this norm, and observed that the Board's post-*Alleluia* decisions had been rejected by the courts of appeals.[53] The Board concluded:

> For all the foregoing reasons, we are persuaded that the [*Alleluia*] *per se* standard of concerted activity ... is at odds with the Act. The Board and courts always considered, first, whether the activity is [actually] concerted, and only then, whether it is protected. This approach is mandated by the statute itself, which requires that an activity be both "concerted" and "protected." A Board finding that a particular form of individual activity warrants group support is not a sufficient basis for labeling that activity "concerted" within the meaning of Section 7.

\* \* \* \* \* \*

**48.** *See, e.g., Mannington Mills, Inc.,* 272 N.L.R.B. No. 15, 117 L.R.R.M. 1233 (Sept. 21, 1984); *see also Allied Erecting & Dismantling Co.,* 270 N.L.R.B. No. 48, 116 L.R.R.M. 1076 (April 30, 1984). In *Mannington Mills,* the employee, William Frie, was a crew leader in the respondent's shipping department, as well as the elected representative of that department's employees to the company's safety committee, a joint management-employee forum for both safety and nonsafety complaints. Shipping department employees had a "long-standing complaint" about the employer's practice of requiring the night-shift crews to perform loading operations left unfinished by the previous shift. In July 1980, Frie, "acting in his capacity as employee representative," raised this complaint with the safety committee and was told to take it up with the night-shift foreman. In October, he discussed the matter with the foreman and stated that the night-shift employees would refuse to perform such assignments in the future. Upholding Frie's discharge, the Board stated that, even accepting Frie's testimony that a number of other employees had indicated to him that they would refuse to perform the work, nothing in the record showed that they had authorized him to make such a threat to the employer. Thus, the Board concluded that, under *Meyers,* Frie's threat constituted individual rather than concerted activity.

**49.** In *Jefferson Elec. Co.,* 271 N.L.R.B. No. 177, 117 L.R.R.M. 1092 (Aug. 21, 1984), a group of workers was exposed to noxious fumes from a production process as a result of a clogged air vent. Some employees complained to management about the fumes, but without success. The next day 11 employees were sent to the employer's doctor; three were hospitalized for periods of up to two weeks. While in the hospital, the employee most severely ill from the fumes filed a complaint about the incident with the state OSHA. She was later discharged for this action and for her pro-union activity. Because it found no evidence that the employee had solicited the support of others before filing her complaint, the Board held her activity unconcerted under *Meyers* and therefore upheld her discharge to the extent that it was motivated by her OSHA-related activity.

**50.** *Meyers* at 3, 115 L.R.R.M. at 1025–26.

**51.** According to the Board, "[t]he wording of that section demonstrates that the statute envisions 'concerted' action in terms of collective activity: the formation of or assistance to a group, or action as representative on behalf of a group." *Id.* at 4, 115 L.R.R.M. at 1026. This interpretation of the statutory language appears to correspond, somewhat roughly, to the standard adopted in *Meyers,* which holds that action is concerted if it is "engaged in with or on the authority of other employees," *id.* at 12, 115 L.R.R.M. at 1029.

**52.** *Id.* at 4, 115 L.R.R.M. at 1026.

**53.** *Id.* at 8–10, 115 L.R.R.M. at 1027–28.

Based on the foregoing analysis, we hold that the concept of concerted activity first enunciated in *Alleluia* does not comport with the principles inherent in Section 7 of the Act. We rely, instead, upon the "objective" standard of concerted activity—the standard on which the Board and courts relied before *Alleluia*. Accordingly, we hereby overrule *Alleluia* and its progeny.[54]

As the foregoing passage makes clear, the Board believed that, in rejecting *Alleluia* and adopting the *Meyers* test, it was returning to the standards applied by the courts and by the Board before *Alleluia*, and that this approach was "mandated by the statute itself."

Contrary to the dissent's view, it is clear from the Board's opinion that it considered not only its rejection of *Alleluia* but also its adoption of the *Meyers* standard to be required by the statute. In the passage quoted above, the Board contrasts the "*per se*" standard of *Alleluia* with the approach it claims was traditionally taken by "[t]he Board and courts," which required that conduct be actually concerted for protection under section 7. This approach, the Board maintains, "is mandated by the statute itself." The Board states shortly thereafter that it will rely "upon the 'objective' standard of concerted activity—the standard on which the Board and courts relied before *Alleluia*," it then proceeds to articulate the *Meyers* standard. We think it could hardly be more clear that the standard the Board adopts is the same approach that it claims was "mandated by the statute itself." Moreover, the Board's adoption of the " 'objective' standard" occurs almost in the same breath as its overruling of *Alleluia*, and was evidently re-garded as based on the same rationale, the Board's view of the requirements of section 7. This reading is confirmed by the Board's opinion as a whole, which is devoted primarily to criticizing *Alleluia* as inconsistent with the Act and contains not a word of justification for its new standard in terms of the policies of the statute. Thus, even if the dissent were correct that the Board did not regard its adoption of that standard as statutorily compelled, it would still be necessary to remand under *Chenery* because in that event the Board would have given no rationale whatsoever for the standard it adopted.

Because, in our view, the Board justified its new test as required by section 7 and as a return to traditional standards for concerted activity, we consider these grounds to determine whether they are correct interpretations of law.[55]

## C. *The Board's Determination That the* Meyers *Standard is Statutorily Required*

Our review of the Supreme Court's decisions interpreting section 7 convinces us that, contrary to the Board's view, the statutory language does not compel it to adopt its present definition of "concerted activities," but rather gives the Board substantial responsibility to determine the scope of that provision in light of its own policy judgment and expertise. The Court has upheld the Board's broad construction of section 7 in a variety of contexts,[56] and has emphasized that "the Board has the 'special function of applying the general provisions of the Act to the complexities of industrial life.' "[57]

---

54. *Id.* at 10–11, 115 L.R.R.M. at 1028–29 (footnote omitted). The Board then proceeded to articulate its new standard for concerted activity. *Id.* at 11–12, 115 L.R.R.M. at 1029.

55. *See FCC v. RCA Communications, Inc.,* 346 U.S. 86, 91, 73 S.Ct. 998, 1002, 97 L.Ed. 1470 (1953); *Chenery,* 318 U.S. at 87, 63 S.Ct. at 459.

56. *See, e.g., Eastex, Inc. v. NLRB,* 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978); *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975); *NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962).

57. *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975) (quoting *NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963)) (citations omitted).

Last Term, in *NLRB v. City Disposal Systems*,[58] the Supreme Court specifically rejected the view that the Board was without authority to interpret "concerted activities" broadly to effectuate the purposes of section 7. In *City Disposal*, as in *Meyers*, a truck driver was discharged when he refused to drive a vehicle that he reasonably believed to be unsafe because of faulty brakes. Unlike Prill, however, the employee in *City Disposal*, James Brown, was covered by a collective bargaining agreement which permitted him to refuse to drive an unsafe vehicle unless the refusal was unjustified. The Board held Brown's conduct protected under the *Interboro* doctrine. The Sixth Circuit, following the prevailing view in the courts of appeals, denied enforcement on the ground that *Interboro* was inconsistent with a literal reading of "concerted activities."[59]

Reversing the Sixth Circuit, the Supreme Court made clear that section 7 does not compel a narrowly literal interpretation of "concerted activities," but rather is to be construed by the Board in light of its expertise in labor relations. While agreeing with the *Meyers* Board that the term "concerted activity" "clearly enough embraces the activities of employees who have joined together in order to achieve common goals,"[60] the Court emphasized that "[w]hat is not self-evident from the language of the Act ... is the precise manner in which particular actions of an individual employee must be linked to the actions of fellow employees in order to permit it to be said that the individual is engaged in concerted activity."[61] The Court continued:

> Although one could interpret the phrase, "to engage in concerted activities," to refer to a situation in which two or more employees are working together at the same time and the same place toward a common goal, the language of § 7 does not confine itself to such a narrow meaning. In fact, § 7 itself defines both joining and assisting labor organizations—activities in which a single employee can engage—as concerted activities. Indeed, even the courts that have rejected the *Interboro* doctrine recognize the possibility that an individual employee may be engaged in concerted activity when he acts alone.[62]

Because the Court found that the meaning of "concerted activities" was subject to varying interpretations based on "differing views regarding the nature of the relationship that must exist between the action of the individual employee and the actions of the group in order for § 7 to apply," it held that the question was for the Board to resolve in light of its expertise in labor relations, as long as its judgment was reasonable.[63] The Court concluded that the *Interboro* doctrine embodied a reasonable view, agreeing with the Board that "[t]he invocation of a right rooted in a collective bargaining agreement is unquestionably an integral part of the process that gave rise to the agreement," a process that extends

---

58. —— U.S. ——, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984).

59. *City Disposal Sys., Inc. v. NLRB*, 683 F.2d 1005 (6th Cir.1982) (per curiam); *see, e.g., Royal Dev. Co. v. NLRB*, 703 F.2d 363, 374 (9th Cir. 1983); *Roadway Express, Inc. v. NLRB*, 700 F.2d 687, 693–94 (11th Cir.1983), *vacated,* —— U.S. ——, 104 S.Ct. 1699, 80 L.Ed.2d 173 (1984); *NLRB v. Buddies Supermarkets, Inc.*, 481 F.2d 714, 719 (5th Cir.1973) (dictum); *NLRB v. Northern Metal Co.*, 440 F.2d 881, 884 (3d Cir. 1971); *see also Kohls v. NLRB*, 629 F.2d 173, 176–77 (D.C.Cir.1980) (expressing doubts about the validity of *Interboro* ), *cert. denied,* 450 U.S. 931, 101 S.Ct. 1390, 67 L.Ed.2d 363 (1981).

60. 104 S.Ct. at 1511 (citing *Meyers* at 3, 115 L.R.R.M. at 1025).

61. 104 S.Ct. at 1511.

62. *Id.* (emphasis added) (footnote omitted). As the Supreme Court noted, the courts that rejected *Interboro* "limited their recognition of this type of concerted activity, however, to two situations: (1) that in which the lone employee intends to induce group activity, and (2) that in which the employee acts as a representative of at least one other employee." *Id.* 104 S.Ct. at 1511 (citations omitted). After *City Disposal*, of course, it is clear that at least a third instance of individual employee action is protected under section 7—the assertion of rights rooted in a collective bargaining agreement.

63. 104 S.Ct. at 1510–11.

from the organization of a union to the enforcement of a collective bargaining agreement achieved through group action.[64]

The Court also found that the *Interboro* doctrine was not inconsistent with the congressional intent in enacting section 7.[65] Reviewing the history of that provision,[66] the Court concluded that Congress, in enacting section 7, had "sought generally to equalize the bargaining power of the employee with that of his employer by allowing employees to band together in confronting an employer regarding the terms and conditions of their employment." [67] Most importantly, the Court observed that "[t]here is no indication that Congress intended to limit this protection to situations in which an employee's activity and that of

his fellow employees combine with one another in any particular way." [68]

Thus, *City Disposal* makes unmistakably clear that, contrary to the Board's view in *Meyers*, neither the language nor the history of section 7 requires that the term "concerted activities" be interpreted to protect only the most narrowly defined forms of common action by employees, and that the Board has substantial responsibility to determine the scope of protection in order to promote the purposes of the NLRA. The Board's failure in *Meyers* to recognize the extent of its own interpretative authority has significant consequences. For example, in the past, both the Board and some courts have held that it is necessary under certain circumstances to accord protection to individual conduct in order to protect the development of collective activity.[69] Simi-

64. *Id.*, 104 S.Ct. at 1511–12.

65. *Id.* 104 S.Ct. at 1512.

66. As the Court explained, the protection for concerted activities originated in §§ 6 and 20 of the Clayton Act, ch. 323, 38 Stat. 730, 731, 738 (1915) (currently codified at 15 U.S.C. § 17 (1982); 29 U.S.C. § 52 (1982)), and § 2 of the Norris-LaGuardia Act, ch. 90, 47 Stat. 70, 70 (1933) (currently codified at 29 U.S.C. § 102 (1982)). These provisions were enacted to exempt peaceful labor activities from the reach of the federal antitrust laws and the common law doctrine of unlawful conspiracy, which held that labor protests that would have been lawful if made by a single individual were nevertheless unlawful if conducted by a group. In Norris-LaGuardia Act § 2, Congress declared that it was the public policy of the United States that "the individual ... worker shall be free from the interference, restraint, or coercion, of employers ... in self-organization or in *other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Id.* (emphasis added). The Clayton and Norris-LaGuardia Acts, however, granted legal protection to these rights only against interference by the federal courts through use of the labor injunction. When Congress adopted the National Industrial Relations Act, ch. 90, § 7(a), 48 Stat. 195 (1933), and the NLRA, ch. 372, § 7, 49 Stat. 449 (1935), it adopted the language of § 2 of the Norris-LaGuardia Act to define the rights of employees against employer coercion and discipline as. well. *See City Disposal*, 104 S.Ct. at 1512–13. *See generally* Gorman & Finkin, *supra* note 27, at 331–46.

The petitioner, joined by the amici, argues on the basis of this history that NLRA § 7 was

intended not to protect only conduct engaged in by two or more employees, but rather to extend to group conduct the same protections to which individual actions were entitled. *See* Brief for Petitioner at 26–29; Brief of Amici Curiae Workers' Rights Law Project (WRLP) and Philadelphia Area Project on Occupational Safety and Health (PHILAPOSH) at 11–17. This interpretation of the history of § 7 has the support of a number of commentators. *See, e.g.,* Gorman & Finkin, *supra* note 27, at 331–46; Lynd, *The Right to Engage in Concerted Activity After Union Recognition: A Study of Legislative History,* 50 Ind.L.J. 720, 726–34 (1975); Note, *Individual Rights for Organized and Unorganized Employees Under the National Labor Relations Act,* 58 Tex.L.Rev. 991, 1006–08 (1980); *see also Illinois Ruan Transp. Corp. v. NLRB,* 404 F.2d 274, 289 n. 6 (8th Cir.1968) (Lay, J., dissenting). We find it unnecessary to consider this argument in the present case, however, since we find that, in any event, the Board was mistaken in its view that the language, history, and prior interpretation of § 7 left it without discretion to consider adopting a broader interpretation of the Act.

67. 104 S.Ct. at 1513.

68. *Id.*

69. *See, e.g., Hugh H. Wilson Corp. v. NLRB,* 414 F.2d 1345, 1347 (3d Cir.1969) ("To protect concerted activities in full bloom, protection must necessarily be extended to 'intended, contemplated or even referred to' group action, ... lest employer retaliation destroy the bud of employee initiative aimed at bettering terms of employment and working conditions.") (quoting *Mushroom Transp. Co. v. NLRB,* 330 F.2d 683, 685 (3d Cir.1964)); cases cited in note 79 *infra.*

larly, in *City Disposal,* the Supreme Court observed that under section 8(a)(1) of the Act "[i]t is possible ... for an employer to commit an unfair labor practice by discharging an employee who is not himself involved in concerted activity but whose actions are related to other employees' concerted activities in such a manner as to render his discharge an interference or restraint on those activities." [70] In *Meyers,* however, the Board failed even to consider whether the discharge of an employee because of his safety complaints would discourage other employees from engaging in collective activity to improve working conditions.

We recognize that the Board did not have the benefit of the Supreme Court's opinion in *City Disposal* when it decided *Meyers,* and that this fact may well have contributed to the Board's misconception of the

scope of its authority under section 7. Our remand in this case will permit the Board to reconsider *Meyers* in light of the Supreme Court's intervening decision in *City Disposal.*

### D. *Decisions of the Courts and Board Before* Alleluia

We also think that the Board was mistaken in its claim that, in adopting the *Meyers* test, it was simply returning to "the standard on which the Board and courts relied before *Alleluia.*" [71] Because the Board relied on a misreading of precedent in selecting the new standard in *Meyers,* we remand the decision for reconsideration under the principles of *Chenery.* [72]

The test adopted by the Board in *Meyers* derives from the Ninth Circuit's one-sentence per curiam opinion in *Pacific Electri-*

---

**70.** 104 S.Ct. at 1512 n. 10.

**71.** *Meyers* at 11, 115 L.R.R.M. at 1029.

**72.** In its brief, Brief for NLRB at 7, 24–27, the Board urges us to uphold its decision partly because it "reasonably acquiesced" in the judicial decisions rejecting the *Alleluia* doctrine, *see* note 27 *supra.* This argument ignores the basic distinction between the Board's rejection of the sweeping *Alleluia* principle and its establishment of the new standard. The Board's rejection of *Alleluia* in no way required it to adopt the test enunciated in *Meyers.*

For other reasons as well, we find the decisions on which the Board relies to be of limited value in deciding the present case. First, many of the cases that rejected *Alleluia* relied on reasoning or on earlier decisions that disapproved all forms of "constructive concerted activity," including the *Interboro* doctrine. *See, e.g., Jim Causley Pontiac v. NLRB,* 620 F.2d 122, 126 n. 7 (6th Cir.1980) (finding adoption of *Alleluia* foreclosed by *ARO, Inc. v. NLRB,* 596 F.2d 713 (6th Cir.1979)); *NLRB v. Bighorn Beverage,* 614 F.2d 1238, 1242 (9th Cir.1980) (relying on several decisions rejecting or criticizing *Interboro* ); *NLRB v. Dawson Cabinet Co.,* 566 F.2d 1079, 1082–84 (8th Cir.1977) (relying on *NLRB v. Northern Metal Co.,* 440 F.2d 881 (3d Cir.1971), and *NLRB v. Buddies Supermarkets, Inc.,* 481 F.2d 714, 719–20 (5th Cir.1973)). As the Board concedes, *see* Brief for NLRB at 26 n. 8, the rationale of such cases does not survive *City Disposal.*

Furthermore, many of the judicial decisions refusing to hold individual action to be concert-

ed did not involve occupational safety or other statutory rights, but rather involved individual employee protests about job conditions. *See, e.g., Ontario Knife Co. v. NLRB,* 637 F.2d 840 (2d Cir.1980); *Pelton Casteel, Inc. v. NLRB,* 627 F.2d 23 (7th Cir.1980). In such cases, the employee's complaint may appear to the court to be little more than a "personal gripe" unworthy of protection under § 7. *See Pelton Casteel,* 627 F.2d at 29. Few of the cases rejecting *Alleluia* involved matters of safety, see, *e.g., Jim Causley Pontiac, supra; Bighorn Beverage, supra,* and we are aware of no such cases in which the conduct for which the employee was disciplined was *required by law,* as in the present case. In a case quite similar on its facts to *Meyers, NLRB v. Lloyd A. Fry Roofing Co.,* 651 F.2d 442 (6th Cir.1981), the Sixth Circuit *upheld* the Board's finding that a truck driver who was discharged for his safety complaints was engaged in conduct protected by § 7. While the court found that there had been considerable group involvement in the safety issue, it also relied on the principles of *Alleluia,* concluding that the driver was protected because he had "attempt[ed] to enforce federal safety and state inspection regulations ... intended to provide *all* employees with a safe job environment and the means to protect themselves against job hazards." *Id.* at 445 (emphasis in original). The Board made no reference to the *Lloyd A. Fry* decision in its *Meyers* opinion; moreover, it made no effort to consider whether the case of an employee who is discharged for conduct required by laws designed for the benefit of all employees may be distinguishable from the judicial decisions that have rejected the theory of implied concerted activity in other contexts.

*cord Co. v. NLRB.*[73] The *Pacific Electri-cord* standard, however, has been followed only in the Ninth Circuit, at least as an exclusive definition of concerted activity. Furthermore, the *Pacific Electricord* test, which had been relied upon by the Ninth Circuit in rejecting the *Interboro* doctrine, was effectively disapproved by the Supreme Court in *City Disposal,* at least insofar as it applied to individual action in the context of collective bargaining.[74] It is equally noteworthy that no other court has followed *Pacific Electricord* in defining "concerted activities" under section 7.[75]

The Board and most courts have historically taken a broader approach to defining the scope of section 7.[76] In particular, the *Meyers* test appears to be narrower in at least two important respects than the standards traditionally applied by the Board and the courts to define concerted activity. First, both the Board and the courts have long held that an individual who brings a group complaint to the attention of management is engaged in concerted activity even though he was not designated or authorized to be a spokesman by the group.[77] In applying the *Meyers* test, however, the Board has essentially required that such a complaint have been specifically authorized by the group in order to be protected under section 7.[78]

Second, the courts have long followed the Board's view that individual efforts to enlist other employees in support of common goals is protected by section 7.[79] The

**73.** 361 F.2d 310 (9th Cir.1966) (per curiam). The Ninth Circuit's statement granting enforcement gives no indication that the test there stated is necessarily intended to be exclusive. *Ontario Knife Co. v. NLRB,* 637 F.2d 840, 845 (2d Cir.1980), which the Board cites as authority for its new test in addition to *Pacific Electricord, see Meyers* at 12 n. 22, 115 L.R.R.M. at 1029 n. 22, articulates no such standard, but rather holds that, to be protected under § 7, "the activity must be 'concerted' or, if undertaken by an individual ..., must be looking towards group action." 637 F.2d at 845.

**74.** *See Royal Dev. Co. v. NLRB,* 703 F.2d 363, 372–74 (9th Cir.1983), *disapproved in City Disposal,* 104 S.Ct. at 1508 n. 4.

**75.** In *ARO, Inc. v. NLRB,* 596 F.2d 713, 718 (6th Cir.1979), the Sixth Circuit formulated a standard for concerted activity that resembled—although it was broader than—the *Pacific Electricord* test adopted by the Board in *Meyers:*

For an individual claim or complaint to amount to concerted action under the Act it must not have been made solely on behalf of an individual employee, but it must be made on behalf of other employees or at least be made with the object of inducing or preparing for group action and have some arguable basis in the collective bargaining agreement. 596 F.2d at 718. In reversing the Sixth Circuit in *City Disposal,* the Supreme Court implicitly disapproved this standard as well, at least as applied to the assertion of rights under a collective bargaining agreement. *See* 104 S.Ct. at 1509–10.

**76.** Indeed, as early as 1953, a review of the Board's decisions found that the Board had adopted an interpretation of § 7 that in effect granted protection even to individual activity that had a tendency to further the common

interests of employees. *See* Note, *The Requirement of "Concerted" Action Under the NLRA,* 53 Colum.L.Rev. 514, 516–20 (1953).

**77.** *See, e.g., NLRB v. Charles H. McCauley Assocs., Inc.,* 657 F.2d 685, 688 (5th Cir. Unit B 1981); *Hugh H. Wilson Corp. v. NLRB,* 414 F.2d 1345, 1349–50 (3d Cir.1969), *cert. denied,* 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970), *enforcing* 171 N.L.R.B. 1040 (1968); *NLRB v. Guernsey-Muskingum Elec. Co-op., Inc.,* 285 F.2d 8, 12 (6th Cir.1960), *enforcing* 124 N.L.R.B. 618 (1959); *Carbet Corp.,* 191 N.L.R.B. 892 (1971).

**78.** *See* note 48 *supra.*

**79.** *See, e.g., Root-Carlin, Inc.,* 92 N.L.R.B. 1313, 1314 (1951); *Central Steel Tube Co.,* 48 N.L.R.B. 604, 612–13, *enforced,* 139 F.2d 489 (8th Cir. 1943). In *Root-Carlin,* an employee was discharged for discussing with various other employees the need to form a union at their plant. Holding the employee's conduct protected, the Board stated, "Manifestly, the guarantees of section 7 of the Act extend to concerted activity which in its inception involves only a speaker and a listener, for such activity is an indispensable preliminary step to employee self-organization." 92 N.L.R.B. at 1314.

In *Meyers,* in order to maintain its view that the NLRB traditionally has required "some kind of group action" to find conduct concerted, the Board treated *Root-Carlin* as resting on the rationale that the conversations involved "interaction among employees." *Meyers* at 4–5, 115 L.R.R.M. at 1026. Although the *Root-Carlin* Board mentioned this point, 92 N.L.R.B. at n. 5, it relied primarily on the policy ground that protecting such activity was essential to the development of employee self-organization. Thus, in explaining the principle the following year,

leading case is *Mushroom Transportation Co. v. NLRB*,[80] which holds that conduct is protected if it is "engaged in with the object of initiating or inducing or preparing for group action or ... had some relation to group action in the interest of employees."[81] As the Supreme Court indicated in *City Disposal*, practically all courts follow *Mushroom Transportation* in holding

such conduct protected.[82] It is not clear, however, that the *Meyers* standard would protect an individual's efforts to induce group action.[83]

The *Mushroom Transportation* standard has been given varying interpretations by the courts of appeals. Some courts have applied the standard narrowly;[84] others have given it a more expansive

the Board stated, "Group action is not deemed a prerequisite to concerted activity, for the reason that a single person's action may be the preliminary step to acting in concert." *Salt River Valley Water Users Ass'n*, 99 N.L.R.B. 849, 853 (1952) (footnote omitted), *enforced in relevant part*, 206 F.2d 325, 328 (9th Cir.1953). The Board continued to follow this view in later cases. *See, e.g., Mason & Hanger-Silas Mason Co.*, 179 N.L.R.B. 434, 439–40 (1969), *enforcement denied on other grounds*, 449 F.2d 425 (8th Cir.1971).

The Board's opinion in *Meyers* also relied on *Continental Mfg. Corp.*, 155 N.L.R.B. 255 (1965), in which the Board found no concerted activity where an employee presented to management a complaint that she claimed was shared by a majority of employees although they were too frightened to speak up themselves. As our discussion has shown, we find that *Continental* did not represent the dominant trend of the Board's pre-*Alleluia* decisions. *See also* Gorman & Finkin, *supra* note 27, at 297–98 & n. 37 (characterizing *Continental* as questionable and inconsistent with Board's other decisions). Indeed, less than two months after *Continental*, the Board, in a decision anticipating *Alleluia*, held that an employee who, without authorization from other employees, filed a complaint with the Department of Labor seeking an investigation of whether her employer was in violation of the Equal Pay Act was engaged in protected concerted activity under § 7. *Montgomery Ward & Co.*, 156 N.L.R.B. 7, 10–11 (1965).

**80.** 330 F.2d 683 (3d Cir.1964).

**81.** *Id.* at 685.

**82.** 104 S.Ct. at 1511; *see, e.g., Owens-Corning Fiberglas Corp. v. NLRB*, 407 F.2d 1357, 1365 (4th Cir.1969) ("The activity of a single employee in enlisting the support of his fellow employees for their mutual aid and protection is as much 'concerted activity' as is ordinary group activity. The one seldom exists without the other.").

**83.** Several considerations suggest that such conduct is not protected under *Meyers*. First, granting protection to the lone employee who seeks to induce group action is not easy to fit within the language of *Meyers*, and the Board's

subsequent cases show that the definition generally will be construed strictly. More importantly, the *Meyers* Board had available to it several decades of judicial and administrative decisions construing § 7. Despite its claim to be returning to an interpretation generally accepted before *Alleluia*, however, it did not adopt the *Mushroom Transportation* standard, which is accepted, at least as a nonexclusive standard, by most courts of appeals. Nor did it adopt the language of the *ARO* case, *see* note 75 *supra*, which incorporated both the *Mushroom Transportation* and *Pacific Electricord* standards. Instead, the Board chose to adopt the language of *Pacific Electricord* alone. One might assume, therefore, that the Board's choice not to endorse the language of *Mushroom Transportation* was deliberate.

Several decisions since *Meyers* contain somewhat conflicting indications on whether the Board will hold efforts to induce group action to be concerted under *Meyers*. In *United Hydraulic Servs., Inc.*, 271 N.L.R.B. No. 18, 116 L.R.R.M. 1450 (June 29, 1984), the majority declined to decide the question whether an employee's distribution of a complaint to his co-workers constituted concerted activity, holding the employee's discharge unlawful on other grounds. Member Dennis would have held the conduct protected, relying not on the *Meyers* standard itself but on *Meyers'* citation to *Ontario Knife Co. v. NLRB*, 637 F.2d 840, 845 (2d Cir. 1980). *See* note 73 *supra*. In two recent cases, divided panels of the Board relied on *Mushroom Transportation* to hold efforts to promote group action concerted. *See Walter Bruckner & Co.*, 273 N.L.R.B. No. 162, 118 L.R.R.M. 1127 (Dec. 14, 1984); *Vought Corp.*, 273 N.L.R.B. No. 161 (Dec. 14, 1984). In both cases, however, the majority consisted of Member Dennis (who wrote separately in *United Hydraulic*) and Member Zimmerman (who is no longer with the Board); Chairman Dotson dissented or declined to reach the issue.

**84.** *See, e.g., NLRB v. Datapoint Corp.*, 642 F.2d 123 (5th Cir. Unit A 1981); *Pelton Casteel, Inc. v. NLRB*, 627 F.2d 23 (7th Cir.1980); *NLRB v. Northern Metal Co.*, 440 F.2d 881 (3d Cir.1971); *Indiana Gear Works v. NLRB*, 371 F.2d 273 (7th Cir.1967). A number of courts relied on *Mushroom Transportation* to reject the *Interboro* doc-

interpretation, emphasizing the Third Circuit's statement that conduct is protected if it "had some relation to group action in the interest of employees."[85] Further, a number of cases have expressed the view that an individual employee engages in concerted activity when the purpose of his acts is to promote the welfare of other workers.[86] Finally, in one case, the Sixth Circuit found concerted activity on facts quite close to those in *Meyers*.[87]

We do not undertake to decide in this case whether the Board is required to follow any particular approach to concerted activity under section 7. Rather, we review these cases in order to see whether the Board was correct in its view that, in adopting the *Meyers* test, it was doing no more than conforming to "the standard on which the Board and courts relied before *Alleluia*." As we have tried to make clear, any fair reading of judicial precedent reveals that the Board's test in *Meyers* is substantially narrower in important respects than the various standards for concerted activity that have been followed by past Boards and most of the courts of appeals. We therefore conclude that, in adopting the *Meyers* test, the Board relied on a misinterpretation of judicial decisions and its own prior cases.

Our conclusion highlights the lack of any meaningful support for the Board's opinion in this case. Not only is the Board's decision grounded on a faulty legal premise (as shown in part III.C. *supra*), it is also flawed by a lack of rationale. We are therefore constrained, under the authority of *Chenery*, to remand this case for reconsideration by the Board.

## CONCLUSION

We hold that, in adopting the *Meyers* test of "concerted activities," the Board failed to rely on its own judgment and expertise, and instead based its decision on an erroneous view of the law. The Supreme Court's decision in *City Disposal* makes clear that the Board is not *required* to give a narrowly literal interpretation to "concerted activities," but has substantial authority to "defin[e] the scope of § 7 '. . . in the first instance as it considers the wide variety of cases that come before it.' "[88] Moreover, we find that, contrary to the Board's view, its *Meyers* standard does not constitute a mere return to the standards traditionally applied by the Board and the courts to define concerted activity, but instead is substantially more restrictive.

This is not a case in which the "mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached."[89] As our discussion has shown, the Board and courts of appeals have taken a variety of approaches to defining "concerted activities," some of which might result in relief for the petitioner. Moreover, the result in a given case will often turn not only on the governing standard but also on the manner in which that standard is applied, and this may well be influenced by whether the

---

trine. *See, e.g., NLRB v. Buddies Supermarkets, Inc.*, 481 F.2d 714, 719 (5th Cir.1973); *Northern Metal, supra.* These decisions were overruled by *City Disposal.* Thus, it is clear that while *Mushroom Transportation* generally establishes a minimum definition of concerted activity applied in the courts of appeals, it is not exhaustive.

85. *See, e.g., Randolph Div., Ethan Allen, Inc.*, 513 F.2d 706, 708 (1st Cir.1975); *Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345, 1355 (3d Cir.1969); *Signal Oil & Gas Co. v. NLRB*, 390 F.2d 338, 342-43 (9th Cir.1968).

86. *See, e.g., NLRB v. Charles H. McCauley Assocs., Inc.*, 657 F.2d 685, 688 (5th Cir. Unit B. 1981); *NLRB v. Sencore, Inc.*, 558 F.2d 433, 434 (8th Cir.1977); *Randolph Div., Ethan Allen, Inc.*, 513 F.2d 706, 708 (1st Cir.1975); *NLRB v. C & I Air Conditioning, Inc.*, 486 F.2d 977, 978 (9th Cir.1973); *Illinois Ruan Transp. Corp. v. NLRB*, 404 F.2d 274, 288-90 (8th Cir.1968) (Lay, J., dissenting); *see also Keokuk Gas Serv. Co. v. NLRB*, 580 F.2d 328, 333-34 (8th Cir.1978).

87. *NLRB v. Lloyd A. Fry Roofing Co.*, 651 F.2d 442 (6th Cir.1981).

88. *City Disposal*, 104 S.Ct. at 1510 (quoting *Eastex, Inc. v. NLRB*, 437 U.S. 556, 568, 98 S.Ct. 2505, 2513, 57 L.Ed.2d 428 (1978)).

89. *Massachusetts Trustees v. United States*, 377 U.S. 235, 248, 84 S.Ct. 1236, 1245, 12 L.Ed.2d 268 (1964).

Board believes the standard to be dictated by the statute itself or rather adopted as a matter of policy in order to effectuate the purposes of the Act. Thus, we cannot say that the Board's error in this case clearly had no bearing on the result reached.

Rather than remand to the Board, the dissent would have this court determine for itself whether, applying the *City Disposal* analysis, the conduct at issue here is sufficiently related to the actions of other employees that it should be held protected under section 7. We believe, however, that such a determination is for the Board and not for this court to make in the first instance. The dissent's extensive efforts to provide a justification for distinguishing between the assertion of rights within and without a collective bargaining context only underscore the failure of the Board to provide a reasoned basis for such a distinction in its own opinion. Our remand in this case is intended to afford the Board a full opportunity to consider such issues in light of the analysis of section 7 in *City Disposal*.

The dissent unaccountably characterizes our opinion as holding that the Board had discretion under section 7 to adopt the *Alleluia* doctrine. However, as we have made clear, we do not find it necessary to consider the validity of *Alleluia* or any other test of concerted activity in this case, and we express no opinion on this issue. The dissent also urges on various grounds that remand is unnecessary because the Board's error in this case is "harmless." We do not believe that an agency decision can be sustained under any notion of "harmless error" where the agency has failed to exercise its lawful discretion and has provided no rational basis for its determination.

Although we, like the Board, find the facts of this case to be egregious, we stress that this in no way forms the basis of our decision. Nonetheless, we think that the facts of this case highlight the Board's failure to give a considered judgment on the issues involved. In the present case, the Board upheld the discharge of an employee for refusing to drive a vehicle determined to be unsafe by state authorities, despite the fact that both the employee and the company were under a legal obligation not to operate the vehicle.[90] Moreover, the Board's decision in *Meyers* produces the anomaly that a unionized worker who complains about safety or other matters covered by a collective bargaining agreement will be held protected under *Interboro* and *City Disposal*, while an unorganized employee will be denied protection for engaging in identical conduct. We agree with the Board that its responsibility is to apply the National Labor Relations Act and not to enforce all state and federal law. This does not mean, however, that with respect to matters within its discretion, the Board should ignore the policy implications of its decisions.

Because we have determined that it was "improper for the [Board] to suppose that the standard it has adopted is to be derived without more from a national policy defined by legislation and by the courts,"[91] we remand the case to the Board for reconsideration of the scope of "concerted activities" under section 7.[92]

*So ordered.*

BORK, Circuit Judge, dissenting:

Petitioner Prill asks this court to set aside an order of the National Labor Relations Board denying him reinstatement and

---

**90.** *See* note 18 *supra.*

**91.** *FCC v. RCA Communications, Inc.,* 346 U.S. 86, 94, 73 S.Ct. 998, 1004, 97 L.Ed. 1470 (1953).

**92.** In view of our disposition of this case, we have no occasion to consider whether the Board's application of its new standard in this case was supported by substantial evidence.

The petitioner also argues that the Board was required to determine whether § 502 of the La-

bor Management Relations Act, 29 U.S.C. § 143 (1982), supports his argument that his conduct is protected under § 7. The Board declined to reach this issue on the ground that it was neither raised nor litigated by the General Counsel at the hearing. *Meyers* at 1 n. 1, 115 L.R.R.M. at 1025 n. 1. We find no basis on which to disturb this ruling by the Board.

other relief. The Board determined that Prill's employer, Meyers Industries, Inc., did not commit an unfair labor practice by discharging Prill, because the conduct for which Prill was discharged was not "concerted activit[y]" under section 7 of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 157 (1982). *Meyers Industries, Inc.,* 268 N.L.R.B. No. 73, 115 L.R.R.M. 1025 (Jan. 6, 1984) (hereinafter referred to as *"Meyers"*). In my view, the Board reached a result that seems to me compelled by section 7. If Prill's actions might be called "concerted," almost any actions might be so characterized and the qualifying word that Congress wrote into the statute would effectively be removed from it. But, in any event, the Board's interpretation of the provision is reasonable and should be upheld without hesitation.

I.

The majority does not purport to disturb any of the Board's findings of fact in this case. It is therefore common ground that Prill was discharged for refusing to drive an unsafe vehicle and entering safety complaints about the vehicle to his employer and to state authorities. *See Meyers* at 15, 115 L.R.R.M. at 1030. It is also common ground that "Prill alone refused to drive the truck and trailer; he alone contacted the Tennessee Public Service Commission after the accident; and, prior to the accident, he alone contacted the Ohio authorities. Prill acted solely on his own behalf." *Meyers* at 16, 115 L.R.R.M. at 1030. Moreover, it is undisputed that as to a similar complaint made in Prill's presence by another driver, one Gove, about the same vehicle, "the judge correctly made no factual finding that Prill and Gove in any way joined forces to protest the truck's condition." *Meyers* at 16–17, 115 L.R.R.M. at 1030.

In the course of applying section 7 to this case, the Board overruled its decision in *Alleluia Cushion Co.,* 221 N.L.R.B. 999, 1000 (1975), which had held that "where an employee speaks up and seeks to enforce statutory provisions relating to occupation-al safety designed for the benefit of all employees, in the absence of any evidence that fellow employees disavow such representation, we will find an implied consent thereto and deem such activity to be concerted." The Board held that "the concept of concerted activity first enunciated in *Alleluia* does not comport with the principles inherent in Section 7 of the Act," and asserted that it would instead rely "upon the 'objective' standard of concerted activity—the standard on which the Board and the courts relied before *Alleluia.*" *Meyers* at 11, 115 L.R.R.M. at 1028–29. The Board then proceeded to set forth a definition of concerted activity that "is an attempt at a comprehensive one, [but] we caution that it is by no means exhaustive. We acknowledge the myriad of factual situations that have arisen, and will continue to arise, in this area of the law." *Id.,* 115 L.R.R.M. at 1029. The *Meyers* reformulation is as follows: "[i]n general, to find an employee's activity to be 'concerted,' we shall require that it be engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." *Id.* at 12, 115 L.R.R.M. at 1029 (footnote omitted).

The majority does not dispute that, if the *Meyers* test is valid, Prill's conduct is not concerted activity and therefore cannot be protected under section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1982). The majority also refrains from holding that Prill's conduct was concerted activity under section 7, and claims to "express no view on whether, under § 7, the Board may adopt the *Meyers* test as an act of discretion." Maj. op. at 948 n. 46. Nonetheless, invoking *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), the majority sets aside the Board's order and remands this case to the Board on the grounds that "the Board misinterpreted the law in two respects." Maj. op. at 948. First, the majority argues that the Supreme Court's decision in *City Disposal Systems, Inc.,* —— U.S. ——, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984), "makes unmistakably clear that, contrary to the Board's view in *Meyers,* neither the language nor the history of section 7 re-

quires that the term 'concerted activities' be interpreted to protect only the most narrowly defined forms of common action by employees, and that the Board has substantial responsibility to determine the scope of protection in order to promote the purposes of the NLRA." Maj. op. at 952. Second, the majority states that "contrary to the view expressed by the Board, we find that the *Meyers* test does not represent a return to the standard relied on by the courts and by the Board before *Alleluia*, but instead constitutes a new and more restrictive standard." *Id.* at 948. Because, in the majority's view, the Board in its discretion could have adopted a definition of concerted activity under which petitioner's conduct would be held to be concerted, remand is required. As I shall show, it is the majority rather than the Board that has misinterpreted the law, and in any event the Board's alleged mistakes, if they existed, would be harmless error under the facts of this case.

## II.

### A.

In this case, the Board has proposed and applied a new test which it regards as consistent with Congress' intent in employing the words "concerted activities" in section 7 of the NLRA. As the majority recognizes, "the task of defining the scope of § 7 is for the Board to perform in the first instance as it considers the wide variety of cases that come before it, and, on an issue that implicates its expertise in labor relations, a reasonable construction by the Board is entitled to considerable deference." *NLRB v. City Disposal Systems, Inc.,* —— U.S. ——, 104 S.Ct. 1505, 1510, 79

L.Ed.2d 839 (1984) (citations and quotation marks omitted). The question for decision would appear to be straightforward: is the Board's new construction of section 7 reasonable or not? The anomalous character of the majority's analysis is well shown by the fact that *the majority never answers this question.*

The Board's reading of section 7 is, in my view, altogether reasonable, and neither *City Disposal* nor any other Supreme Court decision suggests otherwise. In *City Disposal,* the Supreme Court upheld the Board's *Interboro* doctrine, under which an employee's assertion of a right created by a collective-bargaining agreement is treated as concerted activity. *See Interboro Contractors, Inc.,* 157 N.L.R.B. 1295, 1298 (1966), *enforced,* 388 F.2d 495 (2d Cir.1967). The Court noted that the Board in *Meyers* had distinguished cases involving the *Interboro* doctrine from the run of section 7 cases because *Interboro* cases concern conduct that relates back to a collective-bargaining agreement, and concluded that "[t]he *Meyers* case is thus of no relevance here." 104 S.Ct. at 1510 n. 6.[1] That remark alone suggests, rather strongly one would think, that *City Disposal* does not control this case and certainly does not support the majority's position.

The Court described the question to which its opinion was addressed as "whether the Board's application of § 7 ... is reasonable." 104 S.Ct. at 1510. The Court summarized the dispute over the *Interboro* doctrine as one that "merely reflects differing views regarding the nature of the relationship that must exist between the action of the individual employee and *the actions of the group* in order for § 7 to apply."

---

1. Though the Second Circuit originated the *Interboro* doctrine, that court found no inconsistency in rejecting the Board's later efforts—of which *Alleluia* is one example—to find concerted activity in "any case in which a cause advanced by an individual would redound to the benefit of his fellow employees." *Ontario Knife Co. v. NLRB,* 637 F.2d 840, 845 (2d Cir.1980). Writing for the court, Judge Friendly urged that "except in the context of agreements between an employer and his employees which are themselves the product of concerted activities, as in

*Interboro* [,] § 7 ... should be read according to its terms." *Id.* *Interboro* cases were treated specially because "a collective bargaining agreement ... is itself the result of concerted activity." *Id.* That very rationale, of course, is central to the Supreme Court's reasoning in *City Disposal, see* 104 S.Ct. at 1511. Hence *Ontario Knife* tends to confirm the validity of the distinction between the *Interboro* and *Alleluia* doctrines drawn by the Board in *Meyers,* and relied on by the Supreme Court in *City Disposal.*

*City Disposal*, 104 S.Ct. at 1511 (emphasis added). As this language indicates, *some* real connection between the individual's conduct and group action was presupposed by both contending viewpoints before the Court—and the Court in no way repudiated that threshold requirement. For, as the Court went on to say, the process of which the collective bargaining agreement is a part is "a single, collective activity," which "extend[s] through the enforcement of the agreement." *Id.* The "relationship" the Court identified between individual assertions of rights derived from a collective-bargaining agreement and group action was, moreover, essentially identical to the one it perceived between group action and the individual acts of "joining and assisting a labor organization, which § 7 explicitly recognizes as concerted," *Id.* 104 S.Ct. at 1512. In the latter situation, the individual's "actions may be divorced in time, and in location as well, from the actions of fellow employees. Because of the integral relationship *among the employees' actions,* however, Congress viewed each employee as engaged in concerted activity." *Id.* (emphasis added). In a footnote the Court added, "[o]f course, at some point an individual employee's actions may become so remotely related to the activities of fellow employees that it cannot reasonably be said that the employee is engaged in concerted activity." *Id.* 104 S.Ct. at 1512 n. 10. The Court briefly examined the legislative history of section 7, and, finding the *Interboro* doctrine "fully consistent with congressional intent," *id.* 104 S.Ct. at 1513, concluded that "the doctrine constitutes a reasonable interpretation of the Act." *Id.* 104 S.Ct. at 1516.

*City Disposal* establishes only that the *Interboro* doctrine, which presupposes a real and not imaginary relationship between individual conduct and group action as a condition precedent to finding concerted activity, is a reasonable interpretation of section 7. If the Board in *Meyers* had held that the *Interboro* doctrine is inconsistent with the meaning of section 7, I would agree that *City Disposal* would require us to reject the Board's reasoning. If the Board had held that some other type of individual conduct that was equally directly related to group action could not be deemed concerted activity consistently with section 7, I would agree that *City Disposal* would strongly suggest the Board was wrong. But that is not what happened here.

*Meyers* repudiated the *Alleluia* doctrine, which deems individual protest grounded in a worker protection statute to be concerted activity whether or not any other employees are involved in the protest. *Alleluia's* test for concerted activity required less than a "remote" relationship between individual and group activity—it required no relationship at all. *City Disposal* is therefore completely consistent with the Board's determination that "the concept of concerted activity first enunciated in *Alleluia* does not comport with the principles inherent in Section 7 of the Act." *Meyers* at 11, 115 L.R.R.M. at 1028.

Beyond that, I do not think that *City Disposal* establishes that the Board has discretion to adhere to the *Alleluia* doctrine.[2] Nor is there any basis in the language of section 7 for the majority's suggestion that "the case of an employee who is discharged for conduct required by laws designed for the benefit of all employees may be distinguishable from the judicial decisions that have rejected the theory of implied concerted activity in other contexts." Maj. op. at 953 n. 72. *City Dis-*

---

2. The majority denies that it is *holding* that the Board has discretion under section 7 to adopt the *Alleluia* doctrine. Fair enough. But the majority does not explain how its suggestion, that individual complaints relating to safety statutes are distinguishable from other individual complaints, can be reconciled with the language of section 7 except by reliance on one or both of the rationales the majority identifies as underlying the *Alleluia* doctrine. Thus, while not directly endorsing "the sweeping *Alleluia* principle," maj. op. at 953 n. 72, the majority also fails to show that there is a middle ground between *Alleluia* and the general approach taken by the Board in *Meyers* which, consistently with the language of section 7, could result in a finding of concerted activity in this case.

*posal* makes clear that the words "concerted activities" were intended to reach individual conduct that is linked to group activity in any of several ways, but it reaffirms the longstanding rule that there must be both group activity and a clear nexus between that activity and the individual's conduct. The *Alleluia* doctrine destroyed the statutory requirements of group action and a nexus between that action and the individual's conduct, thereby reading the word "concerted" out of section 7 altogether. The *City Disposal* Court's careful effort to ground the *Interboro* doctrine in the language of section 7 confirms the proposition that "§ 7 ... should be read according to its terms." *Ontario Knife Co. v. NLRB,* 637 F.2d 840, 845 (2d Cir.1980). There is no reading of section 7 "according to its terms" that would allow a finding of concerted action in this case or in *Alleluia*-type cases generally.[3] Therefore, while I agree with the majority that the Board believed it had no discretion to adhere to the *Alleluia* doctrine, in my view the Board's belief was entirely correct. Since an individual's appeal to a statute about worker protection involves other workers only in the sense that they "should" be concerned with such protection, it is difficult to see how that case differs from one in which an individual protests about any matter that, in the estimation of the Board or a court, "should" be of concern to other workers. Thus, by sleight of hand, Board or judicial policy replaces congressional pol-

icy, individual behavior becomes group action, and the requirement that activity be "concerted" drops from the law.

Thus, in *Meyers* the Board found that "under the *Alleluia* analytical framework, the Board questioned whether the purpose of the activity was one it wished to protect and, if so, it then deemed the activity 'concerted,' without regard to its form. This is the essence of the *per se* standard of concerted activity." *Meyers* at 9, 115 L.R.R.M. at 1027. This per se standard presumes that what *"ought to be* of group concern," *id.* at 10, 115 L.R.R.M. at 1028, is for the mutual aid or protection of other employees, and therefore that when an individual employee protests over some such matter he is engaging in concerted activity. *Id.* at 10, 115 L.R.R.M. at 1028. The Board contrasted this approach with the practice of the Board and the courts before *Alleluia,* which "generally analyzed the concept of protected concerted activity by first considering whether some kind of group action occurred and, only then, considering whether that action was for the purpose of mutual aid or protection," *Meyers* at 4–5, 115 L.R.R.M. at 1026, and held that the *Alleluia* approach was "at odds with the Act." *Id.* at 10, 115 L.R.R.M. at 1028.

Precisely the same understanding informs *City Disposal,* where the Court noted at the outset that an employee's assertion of a right derived from a collective-bargaining agreement falls "within the 'mutual aid or protection' standard, regardless of

---

**3.** To be sure, there is one reading of section 7 which purports to be literal and which would ratify the *Alleluia* doctrine. That reading was suggested in the dissenting opinion in *Illinois Ruan Transport Corp. v. NLRB,* 404 F.2d 274, 281 (8th Cir.1968) (Lay, J., dissenting): "The words 'concerted activity' are directly related and defined in terms of their intended purpose of 'collective bargaining' or other 'mutual aid or protection.' The phrases are interrelated and derive substantive meaning from each other." *Id.* at 288. On this reading, concerted activity may be found to exist "if there is some reasonable relationship connecting an employee's conduct with the 'mutual aid and protection' of other employees and such activity is based upon rights collectively recognized within a bargaining agreement." *Id.* at 289. In the dissent's view, *Illinois Ruan* turned on the validity of the

*Interboro* doctrine, *see id.* at 283, so Judge Lay was not required to take his interpretation further than he did. Clearly, however, once the meaning of "concerted activit[y]" is defined in terms of the words that follow it, activity is concerted *either* if it is "for the purpose of collective bargaining *or* other mutual aid or protection." 29 U.S.C. § 157 (1982) (emphasis added).

This reading is not truly literal, for it makes the word "concerted" in section 7 utterly superfluous: so long as an individual's conduct is for the "mutual aid or protection" of other employees it will always be deemed concerted. And both the Board in *Meyers* and the Supreme Court in *City Disposal* rejected this reading—the former explicitly, the latter implicitly but no less clearly. *See infra* p. 961.

whether the employee has his own interests most immediately in mind." *City Disposal*, 104 S.Ct. at 1510–11 (citation omitted). Had the Court accepted the reading of section 7 that the Board in *Meyers* identified as underlying the *Alleluia* doctrine, it could simply have said that because rights contained in a collective-bargaining agreement are secured for the mutual aid or protection of all employees who work under that agreement, an individual's assertion of any such right must be deemed to be concerted activity. In fact, however, the Court drew no inference from the finding that the "mutual aid or protection" standard had been met. Instead, the Court based its decision that the *Interboro* doctrine is a reasonable interpretation of section 7 on the integral relationship between the process of collective bargaining—which is indisputably concerted activity—and the assertion of rights based on a collective bargaining agreement. *City Disposal*, then, contains no suggestion that it is within the Board's discretion to adhere to the *Alleluia* doctrine or to any other theory of "constructive" concerted activity that is not grounded in the language of section 7.

### B.

The majority also claims, however, that *City Disposal* establishes that "the Board's opinion is wrong insofar as it holds that the agency is without discretion to construe 'concerted activities' except as indicated in the *Meyers* test." Maj. op. at 948. This claim is flatly wrong because the Board nowhere held or implied any

such thing. The Board did not say that the Act requires the exact formulation it tentatively adopted—it said that the general, pre-*Alleluia* approach which considers "first, whether the activity is concerted, and only then, whether it is protected," is "mandated by the statute itself." *Meyers* at 10, 115 L.R.R.M. at 1028. That is simply another way of saying that section 7 does not authorize the Board to find concerted activity merely because one individual's activity concerns matters that affect the well-being of other employees, and so falls within the "mutual aid or protection" standard. This is the *only* aspect of its legal analysis that the Board claims is "mandated" by the Act,[4] and, as I have demonstrated in Part II–B *supra*, the Board's view that section 7 leaves it without discretion on this point is entirely reasonable and fully consistent with *City Disposal*.[5]

### C.

Even if I agreed with the majority that the Board's opinion held that section 7 required it to adopt a definition of "concerted activit[y]" no broader than the *Meyers* test, and even if I were convinced that such a holding was erroneous, I would not remand in this case. On the facts as we must take them, there is in my view no definition the Board could propose that would, consistently with the language of section 7, afford petitioner relief. For there is no finding here that petitioner's conduct was in any way related to group activity. In order to find concerted activity here, the Board would have been forced to hold that con-

---

**4.** The Board did deny that "section 7, framed as it was to legitimatize and protect group action engaged in by employees for their mutual aid and protection, was intended to encompass the case of individual activity presented here." *Meyers* at 18, 115 L.R.R.M. at 1031. At most, that denial is a claim that the *result* in this case is compelled by the language and purpose of section 7—a claim that indubitably rests on a reasonable interpretation of the statute.

**5.** *FCC v. RCA Communications, Inc.*, 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1953), on which the majority relies in reaching the conclusion that remand is required here, is simply inapposite. *RCA Communications* holds that when an agen-

cy reaches a result in the erroneous belief that the statute compels that result, the court should remand rather than reversing if that result might have been upheld had the agency instead relied on its discretion. Because the Board's discretion in interpreting section 7 is not broad enough to allow the Board to adhere to the *Alleluia* doctrine, or to hold that Prill's conduct was concerted on any other theory, there is no basis for remanding this case. Remand would be "an idle and useless formality. *Chenery* does not require that we convert judicial review of agency action into a ping-pong game." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 1430 n. 6, 22 L.Ed.2d 709 (1969).

cert can be presumed where two employees complain about the same piece of equipment on different occasions, merely because the second employee to complain was aware of the first employee's protest. Obviously, the *first* employee's protest would not be concerted even under this presumption. Hence the Board would be treating the second protest as concerted not because it was related to group activity but merely because it resembled another employee's individual conduct. The language of section 7 does not admit of such a reading. Since the Administrative Procedure Act requires us to review with due regard for "the rule of prejudicial error," 5 U.S.C. § 706 (1982), I would deny the petition and let the alleged infirmities in the *Meyers* test await challenge on another occasion.

### III.

The second flaw the majority finds in *Meyers* is "a misreading of precedent in selecting the new standard." Maj. op. at 953. The majority's forced reading of the *Meyers* test wrongly presupposes that the Board intends that test to be exhaustive and resolves every doubt in favor of construing the *Meyers* test so that it appears as narrow as possible. The Board, it bears emphasizing, explicitly stated that the *Meyers* test is not meant to be exhaustive, and may be modified as the Board grapples with the "myriad of factual situations" that can be expected to arise under section 7. *Meyers* at 11, 115 L.R.R.M. at 1029. It is virtually certain that there is at least one category of cases the Board would treat as exceptions to the *Meyers* test: cases involving the assertion of rights under a collective-bargaining agreement (for the Board specifically distinguished the *Interboro* line of cases, *see id.* at 11, 115 L.R.R.M. at 1028). The *Meyers* test, as applied to the facts of this case, holds only that, *Inter-* •

*boro* cases aside, the Board now requires (1) some evidence of intent to actually induce concerted activity, or (2) some evidence of mutual reliance on the conduct or support of other employees, or (3) some evidence of an actual agreement between employees to protest a given situation, as a condition precedent to a finding of concerted action. *Nothing more than this can reliably be made out from Meyers,* and the majority does not establish that this interpretation of section 7 runs counter to · the case law.

The proof of this is that neither of the "two important respects" in which the majority finds the *Meyers* test "narrower" than "the standards traditionally applied by the Board and the courts to define concerted activity," maj. op. at 954, can be established on the basis of the record and decision in the present case. The majority's initial claim, that "the new definition will be strictly construed to include only activity clearly joined in or endorsed by other employees," *id.* at 948, *see also id.* at 954, rests solely on the majority's reading of the Board's subsequent decisions in *Mannington Mills, Inc.,* 272 N.L.R.B. No. 15, 117 L.R.R.M. 1233 (Sept. 21, 1984), and *Allied Erecting & Dismantling Co.,* 270 N.L.R.B. No. 48, 116 L.R.R.M. 1076 (Apr. 30, 1984). *See* maj. op. at 948–949 & n. 48.[6] In *Meyers* itself, the only indication given as to the Board's standard in "endorsement" cases is the Board's remark that "there is no evidence here ... that either [Prill or Gove] relied in any measure on the other when each refused to drive the truck." *Meyers* ˈat 17, 115 L.R.R.M. at 1030. That reveals only that *no* reliance will not constitute authorization—it does not tell us how much reliance will suffice. Similarly, the principal indication in *Meyers* as to the scope of the words "with ... other employees" in the *Meyers* test is the

---

**6.** In addition, the facts of *Ontario Knife Co. v. NLRB,* 637 F.2d 840 (2d Cir.1980), which the Board cited as support for the *Meyers* test, rather clearly resemble those in *Mannington Mills* and *Allied Erecting & Dismantling Co. Ontario Knife,* which found no concerted activity in an individual employee's refusal to work, despite prior activity (in which the same employee was a participant) that was clearly concerted and related to the same issue involved in the refusal to work, *see* 637 F.2d at 842–43, suggests that at least this degree of strict construction has some authoritative support in the case law.

Board's finding that "there is no evidence here that there was any concerted plan of action between Gove and Prill." *Meyers* at 17, 115 L.R.R.M. at 1030.[7] From this we can infer that the Board will not find a "concerted plan of action" where two employees complain about the same piece of equipment on different occasions, even though the second employee was aware of the first employee's protest. The Board's use of the words "concerted plan of action" suggests that some kind of agreement between the two must be established, but it remains unclear how express that agreement must be, for the record is barren of any evidence even suggesting agreement.

The majority's willingness to go beyond the confines of the record before us to consider how the *Meyers* test has been applied by the Board in subsequent cases is highly questionable. We are reviewing an *order* issued by the Board in *this* case, not a rule or regulation promulgated after notice-and-comment rulemaking, in which we must necessarily consider how the challenged rule will be applied in whatever cases are likely to arise. If the *Meyers* test, as applied to petitioner Prill, is a reasonable interpretation of the statute, the order should be sustained. The reasonableness of the *Meyers* test as applied in subsequent cases can and should be reviewed when the orders in those cases come before a court.

Moreover, even if these subsequent decisions could properly be considered here, there is simply no connection between this criticism of the *Meyers* test and the result reached in this case. The majority concedes that, even if the Board did misinterpret pre-*Alleluia* case law, remand would be inappropriate if that mistake clearly had no bearing on the substance of the decision reached as to petitioner Prill. *See* maj. op. at 956. Since there was no evidence that other employees in any way joined in or endorsed petitioner's conduct, that branch of the majority's critique cannot possibly affect the outcome here.

The majority's second objection is that "it is not clear … that the *Meyers* standard would protect an individual's efforts to induce group action." Maj. op. at 955. The majority notes that the Board declined to reach this question in a post-*Meyers* case, *see id.* at 955 n. 83, and proceeds to engage in the highly speculative enterprise of deducing, from the Board's choice of citations, that the Board will not hold individual efforts to induce group action to be concerted. *Id.* The majority gives the impression that the *Meyers* test, whose wording is borrowed from the Ninth Circuit's language in *Pacific Electricord Co. v. NLRB*, 361 F.2d 310 (1966) (per curiam), represents a conscious choice on the Board's part to adopt a formulation that no other circuit has followed,[8] while rejecting

7. What we can, I think, be confident of is that the Board does *not* mean that if the employer here had offered the keys to Prill's truck to each of his assembled drivers one day, and each had refused to drive it, the Board would find no concerted activity. Under such circumstances, conscious parallelism would be very strong evidence of spontaneous but quite concerted activity. *Cf. NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962) (holding a spontaneous walk-out protesting working conditions in a non-union plant concerted protected activity). The Board did say that "*individual* employee concern, even if openly manifested by several employees on an *individual* basis, is not sufficient evidence to prove concert of action," *Meyers* at 17, 115 L.R.R.M. at 1030, and those words could be taken to mean that even this degree of visible cooperation is not concerted activity. But that remark is dictum— and it will also bear a different, narrower, and

more sensible meaning. I would give it that meaning.

8. The Board borrowed the wording of its non-exhaustive *Meyers* test from that one-sentence opinion, but it also cited as supporting authority Judge Friendly's trenchant opinion for the Second Circuit in *Ontario Knife Co. v. NLRB*, 637 F.2d 840 (1980). Judge Friendly recognized the "inducement" exception to the general rule that only concerted activity comes within section 7, which he traced to the fact that "§ 7 is not limited to concerted activity per se. Instead, it protects the 'right to engage in … concerted activities.'" *Ontario Knife Co.*, 637 F.2d at 844–45. Since workers have the *right* to engage in concerted activity, Judge Friendly agreed that "as the Third Circuit recognized in *Mushroom Transportation Co. v. NLRB*, 330 F.2d 683 (3 Cir.1964), employers cannot obstruct an employee's efforts to exercise those rights. Indi-

the predominant standard, which, according to the majority, is that set out in *Mushroom Transportation Co. v. NLRB*, 330 F.2d 683 (3d Cir.1964). The *Mushroom Transportation* standard differs from the *Meyers* test principally in that it explicitly states that "a conversation may constitute a concerted activity although it involves only a speaker and a listener, but to qualify as such, it must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees." 330 F.2d at 685.

The majority has overlooked the Board's finding that neither Prill's refusal to drive the truck nor driver Gove's earlier refusal, to which Prill was an accidental and silent witness, was "intended to enlist the support of other employees," *Meyers* at 17, 115 L.R.R.M. at 1031. If the majority were right in thinking that the *Meyers* test eliminates the "inducement" category of cases from the definition of concerted activity, the Board would have had no need to make this finding.

The majority also slights the Board's discussion of *Root-Carlin, Inc.*, 92 N.L.R.B. 1313 (1951), which the majority cites as one of the leading cases holding that individual attempts to induce concerted activity are themselves concerted. The Board in *Meyers* relied on *Root-Carlin* as one of a series of cases it read as "defin[ing] concerted activity in terms of employee interaction in support of a common goal," *Meyers* at 5, 115 L.R.R.M. at 1026—cases the Board clearly approved. The Board plainly indi-

cated that, at a minimum, individual efforts to induce group action that *"involve[ ] only a speaker and a listener,"* id. at 5, 115 L.R.R.M. at 1026 (quoting *Root-Carlin, Inc.*, 92 N.L.R.B. at 1314 (emphasis added by the Board in *Meyers* )), will be treated as concerted when the speaker, an employee, is addressing the listener, another employee.

Indeed, any fair reading of the *Meyers* opinion would treat it as incorporating the *Mushroom Transportation* standard, at least as applied by the court that framed it. It was precisely because the "interaction" among employees present in the conversation in *Root-Carlin, Inc.* was absent in *Mushroom Transportation* that the court in the latter case found that the individual employee's conduct was not concerted. It reached that result, despite the fact that the discharged employee "had been in the habit of talking to other employees and advising them as to their rights," 330 F.2d at 684, because there was no evidence that his "talks with his fellow employees involved any effort on his or their part to initiate or promote any concerted action to do anything about the various matters as to which [he] advised the men or to do anything about any complaints and grievances which they may have discussed with him." *Id.* at 684–85. A finding of no concerted activity in the present case would seem to follow *a fortiori* from *Mushroom Transportation*—for in the present case there was not even a conversation between petitioner and another employee about common grievances, let alone one directed towards concerted activity.[9]

vidual activity can be protected, therefore, if it is 'looking toward group action.' *Mushroom Transportation*, 330 F.2d at 685."

Judge Friendly's statutory argument is a powerful one, and it indicates what is wrong with holding the Board to the standard of exactitude the majority demands of the *Meyers* test. The Board in *Meyers* focused, quite understandably, on the words "concerted activities" in section 7, and although it clearly indicated that it would treat at least some "inducement" cases as involving concerted activity, the majority is right in finding some difficulty in bringing such cases within the literal language of the *Meyers* test. But we are not to suppose that the Board will

set that test in concrete, nor should we rush to assume that in a case in which "the *right* to engage in ... concerted activities" is before it, the Board will not adopt the *Mushroom Transportation* standard on the statutory grounds given by Judge Friendly in *Ontario Knife*. Here, that issue was not presented, because there was no evidence whatsoever that petitioner's conduct was "looking toward group action."

9. The majority correctly notes that Prill talked to other drivers about the defective brakes on his truck, *see* Tr. at 18, J.A. at 42, but there is no indication that these conversations concerned a common grievance, *e.g.*, a pattern of shoddy

The "inducement" branch of the majority's critique rests, then, on a misreading of the *Meyers* opinion. Beyond that, the only way in which this alleged error could possibly affect the outcome in this case would be if the Board could have held that where one employee overhears another employee's complaint (as Prill did Gove's), an effort to induce concerted activity on the *second* employee's part should be inferred without more. Any such inference would be preposterous, and the majority has not pointed to a single case as so holding, let alone established a clear line of authority to that effect.[10] Consequently, even if the majority's dubious criticisms of the Board's reading of the case law in *Meyers* prove well-founded, they are harmless error that cannot support a remand in this case.

### IV.

There have been protests in recent years that the "concerted activity" requirement produces such anomalous results that anything resembling a literal reading of section 7 should be abandoned. *See, e.g.,* Gorman & Finkin, *The Individual and the Requirement of "Concert" Under the National Labor Relations Act,* 130 U.Pa.L. Rev. 286 (1981); *see also Illinois Ruan Transport Corp. v. NLRB,* 404 F.2d 274,

281 (8th Cir.1968) (Lay, J., dissenting). It is a sufficient response that the choice to require that activity be concerted before it may be protected "is one decided by Congress when it drafted § 7. It is not a choice that can be undone by the courts for policy reasons." *E.I. du Pont de Nemours & Co. v. NLRB,* 707 F.2d 1076, 1078 n. 2 (9th Cir.1983). Moreover, as the four dissenting Justices in *City Disposal* pointed out (without controversion by the majority), "[b]y providing an increased degree of statutory coverage to employees participating in that process, the labor laws encourage and preserve the 'practice and procedure of collective bargaining.' The fact that two employees acting together receive coverage where one acting alone does not is therefore entirely consistent with the labor laws' emphasis on collective action. *See NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967); *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 653, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965)." *City Disposal,* 104 S.Ct. at 1518 (O'Connor, J., dissenting) (additional citations omitted). Because what the Board did here was compelled by that congressional choice, I would uphold its order.[11] I therefore respectfully dissent.

maintenance by Meyers Industries that had prompted complaints from other drivers about their trucks, or that Prill sought to enlist the aid of other drivers in any way.

**10.** The majority does cite a line of cases including *Guernsey-Muskingum Elec. Coop., Inc.,* 124 N.L.R.B. 618 (1959), *enforced,* 285 F.2d 8 (6th Cir.1960), and *Hugh H. Wilson Corp.,* 171 N.L.R.B. 1040 (1968), *enforced,* 414 F.2d 1345 (3d Cir.1969), in which the Board treated individual complaints as protected if they related to a matter of moment to other employees and if the individual was acting for the benefit of the interested group. *See* maj. op. at 945 & n. 24. But the holdings of those cases are little different (and, if anything, narrower) from one of the rationales the majority identifies as underlying the *Alleluia* doctrine: "the Board's familiar view that an individual's activity should be protected if it relates to a matter of 'mutual concern' to employees." Maj. op. at 946. That rationale, as I show in Part II–A, reads the word "concerted" out of section 7, and finds no support in *City Disposal.* And, while that rationale may be "familiar," it has also repeatedly been rejected by

the courts of appeals; even when the courts have enforced the Board's orders, they have generally done so because they found actual group activity to which the individual employee's conduct was immediately related. *See, e.g., Hugh H. Wilson Corp.,* 414 F.2d at 1354 (finding concerted activity because "[i]n substance, the employees had a gripe. They assembled. They presented their grievance to management...."); *Guernsey-Muskingum Elec. Coop.,* 285 F.2d at 12 (finding concerted activity because "a reasonable inference can be drawn that the men involved considered that they had a grievance and decided, among themselves, that they would take it up with management").

**11.** The majority's suggested limitation of the *Alleluia* presumption of concerted activity to situations where the employee's conduct is required by laws intended to benefit all employees cannot be linked in any way to the language of section 7, and is therefore completely unpersuasive. The policy considerations that underlie the majority's suggestions should be addressed to the legislature or to the state courts as expositors of the common law. In this connection it

is noteworthy that the recent adoption in some states of a "public policy" exception to the employment-at-will doctrine would appear to protect employees who find themselves in a predicament such as petitioner's. *See, e.g., Petermann v. International Bhd. of Teamsters,* 174 Cal. App.2d 184, 344 P.2d 25 (1959); *Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981); *Sventko v. The Kroger Co.,* 69 Mich.App. 644, 245 N.W.2d 151 (1976). Indeed, Michigan, where Meyers is located and where Prill was employed, has enacted a statute giving an employee who is discharged for reporting a suspected violation of federal or state law to a public body a cause of action for reinstatement with back pay. Mich. Comp.Laws Ann. §§ 15.361 to .364 (1981). That

whistle-blowing statute, however, did not go into effect until after Prill was discharged, and it is also unclear whether the statute's definition of "public body" includes agencies of other states. *See* Mich.Comp.Laws Ann. § 15.361(d). Even before adoption of the whistle-blowing statute, there is some reason to think that Prill would have had a cause of action under state common law. *See Trombetta v. Detroit, T. & I.R.R.,* 81 Mich.App. 489, 265 N.W.2d 385 (1978) (holding that allegations that an employee was discharged for refusing to falsify pollution control reports required by law to be filed with state agency state a claim for which relief can be granted under Michigan law). But it is not for us or the Board to pre-empt these developments.