843 F.2d 1444
 269 U.S.App.D.C. 116
 CONTINENTAL AIR LINES, INC., Petitioner,
v.
DEPARTMENT OF TRANSPORTATION, Respondent,
America West Airlines, Inc., Southwest Airlines Co., City of
Dallas, Texas, et al., Intervenors.
CITY OF DALLAS, TEXAS, et al., Petitioners,
v.
DEPARTMENT OF TRANSPORTATION, Respondent,
America West Airlines, Inc., Southwest Airlines Co.,
Continental Air Lines, Inc., Intervenors.
SOUTHWEST AIRLINES CO., Petitioner,
v.
DEPARTMENT OF TRANSPORTATION, Respondent,
America West Airlines, Inc., Continental Air Lines, Inc., Intervenors.
 Nos. 86-1026, 86-1039 and 86-1040.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 8, 1986.
Reargued March 9, 1988.
Decided April 8, 1988.
 
 Paul Y. Seligson, with whom Paul M. Ruden and Robert W. Kneisley, Washington, D.C., were on the brief, for Southwest Airlines Co., petitioner in No. 86-1040 and intervenor in Nos. 85-1026 and 86-1039.
 Michael F. Goldman, with whom Julie A. Swanson, Washington, D.C., was on the brief, for City of Dallas, et al., petitioners in No. 86-1039 and intervenors in Nos. 86-1026.
 Ronald A. Stern, Washington, D.C., for Continental Airlines, petitioner in No. 86-1026 and intervenor in Nos. 86-1039 and 86-1040. Thomas D. Goldberg, Andrew T. Karron, Washington, D.C., and Richard B. Hirst were on the brief for Continental Airlines, petitioner in No. 86-1026 and intervenor in Nos. 86-1039 and 86-1040. Calvin J. Collier, Washington, D.C., entered an appearance for Continental Airlines.
 Kenneth N. Weinstein, Atty., Dept. of Transp., with whom John J. Powers, III and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondent in Nos. 86-1026, 86-1039 and 86-1040.
 John E. Gillick, Washington, D.C., entered an appearance for intervenor, America West Airlines, Inc. in Nos. 86-1026, 86-1039 and 86-1040.
 Before STARR, SILBERMAN and WILLIAMS,* Circuit Judges.
 Opinion for the Court filed by Circuit Judge STARR.
 STARR, Circuit Judge:
 
 
 1
 These consolidated cases raise several issues under a provision of law which has come to be known as the Love Field Amendment. Love Field is an airport situated in Dallas, Texas. Once Dallas' leading airport, Love Field has been eclipsed by the mammoth Dallas/Fort Worth International Airport ("DFW") situated conveniently between the two cities that bear its name. The questions before us are: (1) whether the Department of Transportation properly interpreted the Love Field Amendment so as to permit service at Love Field by Continental Air Lines, Inc., an "interlining" carrier (that is, one with connecting flights with other airlines); (2) whether the agency properly interpreted the commuter airline exception to the Love Field Amendment; (3) whether the agency's interpretation of the Amendment's restrictions on certain Love Field-related advertising ran afoul of First Amendment protections of commercial speech; and (4) whether Continental's failure to raise its constitutional objection in the agency proceedings precludes its maintaining that claim before us.
 
 
 2
 For the reasons that follow, we conclude that the Department's interpretation of the Love Field Amendment passes muster under the now familiar principles enunciated in Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and its progeny. We further conclude that Continental's constitutional assault on the Department's advertising ban founders by virtue of the airline's failure to present its claim to the agency in contravention of the statutorily ordained requirement of exhaustion of administrative remedies.
 
 
 3
 * The much heralded opening of the Texas-size airport at DFW ushered in a new era for the once busy facilities at Love Field. Now a mere shadow of its former self, Love Field lives on in rather modest circumstances. Of relevance to our case is a restriction fashioned by Congress in February 1980 as part of the International Air Transportation Competition Act of 1979, Pub.L. No. 96-192, 94 Stat. 35 (1980). In the bowels of that internationally oriented measure is a provision of a distinctly parochial, domestic nature. Section 29 was designed to except Love Field from the liberalized entry provisions of the Airline Deregulation Act of 1978, Pub.L. No. 95-504, 92 Stat. 1705 (1978), which the reader doubtless knows signaled the demise of federal economic regulation of the domestic airline industry. The reason for the exception was, of course, to protect DFW from competition at Love Field. Its purpose is well captured by the Department in its brief before us:
 
 
 4
 The Amendment was a compromise solution to a longstanding controversy involving attempts by the cities of Dallas and Fort Worth to prohibit interstate operations at Love Field and other area airports so as to ensure the viability of new Dallas/Ft. Worth Regional Airport.
 
 
 5
 DOT Brief at 6-7.
 
 
 6
 The Love Field Amendment has three subsections. Subsections (a) and (b) are set forth in the margin.[1] It is the meaning of subsection (c) that is the principal bone of contention before us. We shall presently quote the provision in full, but to lead the reader gently into the somewhat forbidding language, we should observe in general fashion that it sets forth exceptions to an otherwise comprehensive ban on interstate operations at Love Field. The DFW parties describe this provision in the following way:
 
 
 7
 [I]t provides a limited exception to Sections 29(a) and (b), in situations where the service provided is between Love Field and one or more points in Louisiana, Arkansas, Oklahoma, New Mexico and Texas [the "Love Field Service Area"], and where two other conditions are met.
 
 
 8
 Brief of DFW Petitioners at 7.
 
 
 9
 With that brief introduction, we set forth the provision, cum its critical (to this litigation) two conditions:
 
 
 10
 (c) Subsections (a) and (b) shall not apply with respect to, and it is found consistent with the public convenience and necessity to authorize, transportation of individuals, by air, on a flight between Love Field, Texas, and one or more points within the States of Louisiana, Arkansas, Oklahoma, New Mexico, and Texas by an air carrier, if (1) such air carrier does not offer or provide any through service or ticketing with another air carrier or foreign air carrier, and (2) such air carrier does not offer for sale transportation to or from, and the flight or aircraft does not serve, any point which is outside any such State. Nothing in this subsection shall be construed to give authority not otherwise provided by law to the Secretary of Transportation, the Civil Aeronautics Board, any other officer or employee of the United States, or any other person.
 
 
 11
 Faced with this rather dreadfully framed language, DOT nonetheless ruled in the proceeding at hand that the statute, coupled with its legislative history, was crystal clear. The Department concluded that "the plain and literal meaning of subsection (c) refers to a specific 'flight,' and subclauses (1) and (2), which must logically be read together (the clauses are joined by the conjunction 'and'), describe restrictions applicable to the flight.... [T]he legislative history is not contrary to this plain reading; and this reading is not unreasonable." Joint Appendix ("J.A.") at 8-9. Unless this opening language ("on a flight") in subclause (c) was taken to apply to both subclauses (1) and (2), DOT reasoned, the provisions would necessarily exclude from Love Field an air carrier that operated interstate flights (other than in the Love Field Services Area) anywhere on its system. That result, the Department found, was foreclosed by clear legislative history to the contrary. Accordingly, the Department determined that Continental's proposed move into Love Field (to inaugurate a Dallas-Houston service) was permissible under the Love Field Amendment, notwithstanding the fact that Continental was an "interlining" carrier. As DOT summarized its view:
 
 
 12
 Congress intended to make Love Field a short-haul airport limited to turnaround intrastate and interstate service in five states. As a result, subclauses (1) and (2) are not properly read as class and operational restrictions, respectively. Rather, these subclauses simply specify interline and on-line restrictions applicable to service at Love Field.
 
 
 13
 Id. at 12. It is this interpretation which is now under challenge.
 
 
 14
 The parties have jousted skillfully (and at length) over the meaning of the key provision of the Love Field Amendment. Here, in brief, are the competing positions: Joined by Southwest Airlines, the DFW parties contend that the statute is plain and clear. In their view, section 29(c)(1) "is a class restriction; the carrier cannot be of a class which provides through service or ticketing with another air carrier." DFW Brief at 7. The second clause, in turn, is seen as an "operational restriction." Id. That is, "the air carrier cannot route its flight or sell transportation from Love Field to a point outside of the five enumerated states." Id. at 7-8.
 
 
 15
 The DFW parties buttress their position by pointing to a helpful sentence in the Conference Committee Report,[2] which they candidly allow "to some extent tracks the statutory words." DFW Brief at 33. The DFW parties also emphasize the views of now-Speaker Wright, who was the animating force behind the Love Field Amendment (including views expressed long after enactment of the measure).[3]
 
 
 16
 For its part, DOT, joined on this issue by Continental, continues to maintain that the statute is indeed plain and clear, but in quite the opposite way from that of the DFW parties' reading. Emphasizing both the clarity (as DOT sees it) of the statutory language and the judiciary's obligation to defer to reasonable agency interpretations, DOT stresses that Congress' employment of the phrase, "on a flight," at the beginning of subsection (c) most naturally should be taken to mean that the restrictions found in (c)(1) and (c)(2) are applicable solely to Love Field flights. Quite apart from what it describes as "sophisticated parsing of sentences," the Department trumpets the fact that Congress' intent in crafting the Love Field Amendment was solely to limit that airport to " 'short haul' " service. DOT Brief at 23. Congress' disavowal of Congressman Wright's more sweeping exclusionary approach was aptly captured, DOT suggests, by Congressman Anderson, a member of the Conference Committee and floor manager of the measure in the House. Congressman Anderson had this to say during the floor debate:The report refers to "turn-around" service between Love Field and points within the four contiguous States. This restriction is intended to limit flights serving Love Field, and only those flights, to the State of Texas and the four contiguous States, but is not intended to limit the number of cities served on such flights, so long as these cities are in those five States. Also there is no intent to limit flights by a carrier serving Love Field which do not serve Love Field at all, such as a New York-Miami flight. Finally, the prohibition in section 29(c)(1) against an air carrier providing through service or ticketing with another air carrier or foreign air carrier only applies with respect to a carrier's Love Field service and does not affect its usual ticketing, scheduling, and ratemaking practices at other points on its system.
 
 
 17
 126 Cong.Rec. 520 (1980), J.A. at 32.
 
 
 18
 Reflecting on the warring factions now before us, we cannot but observe at the outset the irony of diametrically opposed positions, ably advanced all around, that the statute is clear. Yet, the two clear and plain meanings advanced to us are polar opposites. Under these rather unusual circumstances, it would be easy to say that two proposed (but hopelessly inconsistent) "plain" meanings inevitably add up to a statute infected with ambiguity. That is especially so since, as the Supreme Court has on occasion concluded, ambiguity may lurk even in a statute that appears refreshingly clear on its face. See, e.g., Young v. Community Nutrition Institute, 476 U.S. 974, 106 S.Ct. 2360, 90 L.Ed.2d 959 (1986); United Steelworkers of America v. Weber, 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979).
 
 
 19
 We shall, however, resist the temptation to succumb to such facile modes of analysis, and begin, as courts are enjoined to do, with the terms of the statute itself. Our reflections lead us to the view that neither party's approach is quite right. To be sure, the statute does appear more naturally to lend itself to the agency's reading, primarily for the reasons stated by DOT. That is, Congress saw fit to employ the language "on a flight" in the lead-in passage to both clauses. The DFW parties' reading of the statute would render that lead-in language largely superfluous.
 
 
 20
 Furthermore, DOT's construction lends itself to a more harmonious reading of the clauses as a whole. First, consider the meaning of clause (c) if it did not contain the 8-word phrase of (c)(2), "and the flight or aircraft does not serve." Subclause (c)(2) would, if read to encompass the entire airline rather than only its Love Field operations, prohibit Love Field flights by any airline that operated flights outside the five-state Love Field Service Area. But this result, all parties agree, Congress did not intend; the condition must be limited to flights in and out of Love Field. Because the two subclauses of (c) appear to be parallel, (c)(1) must also, the argument goes, impose a restriction only with respect to Love Field operations.
 
 
 21
 Now reinsert the 8-word phrase into subclause (c)(2). Whatever the precise meaning Congress intended by the addition of this phrase, it is most naturally read as tightening the restriction expressed in (c)(2). Petitioners' argument, however, is essentially that this additional language makes the (c)(2) restriction looser than (c)(1). This reading of the additional language makes little sense, and therefore DOT's interpretation of the clause is the more persuasive of the two.
 
 
 22
 With respect to the legislative history, both parties have scored debating points, with a slight margin going, we believe, to the agency. The remarks of Congressman Anderson, helpfully for DOT, echo the provisions of the Conference Report itself, the pertinent portion of which supports the agency's reading.
 
 
 23
 Although we thus believe that DOT's reading of the statute is the more natural, we are not persuaded that Congress' intent is clear within the meaning of Chevron. That is to say, our employment of the traditional tools of statutory interpretation has left us in doubt as to what Congress had in mind on the precise issue at hand. The double negatives infecting the provision in question have added to our interpretive difficulty. What is more, this provision stands alone. Answers are thus not to be found in a structural analysis of the statute. Cf. INS. v. Cardoza-Fonseca, --- U.S. ----, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Although the Supreme Court just the other day reminded the lower courts that "[s]tatutory construction ... is a holistic endeavor," United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd., --- U.S. ----, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988), this stand-alone, rifle-shot provision contained in the midst of a statute on international aviation matters will not, through structural analysis, yield definitive answers to the question confronting us.
 
 II
 
 24
 By virtue of ambiguity in the statutory provision, we move to an analysis of the reasonableness of the agency's interpretation under the second step of Chevron. The question, as Chevron aficionados know, is whether the agency's interpretation is reasonable or permissible. If it is, the judiciary is obliged to defer, even if it would have come to quite a different view if left to its own devices.
 
 
 25
 The reason for this now familiar principle in our law is not hard to discern. It springs from fundamental principles of separation of powers. Congress has seen fit not only to enact measures which, with Presidential approbation, have become law, but to entrust those measures to Congressionally created (again, with Presidential approval) agencies to carry out the mandate of Congress. Naturally, the administration and enforcement of a statute call upon the agency charged with its execution to interpret it. The most obvious example is when Congress specifically directs the agency to engage in the legislative function of fashioning rules with binding effect. The paradigm, as the professoriat likes to say, of an express delegation of legislative power is to be found in Batterton v. Francis, 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977), where Congress, in effect, broadly charged the Secretary of HHS (then HEW) to promulgate regulations giving content to a broad legislative mandate to provide a financial assistance program for families with dependent children.
 
 
 26
 This case presents quite a different kettle of fish. The agency was not called on a la Batterton v. Francis, to carry on and "legislate" where Congress left off. Here, Congress fashioned a specific provision which the agency (once CAB, now DOT) has been called upon to interpret. Each of the parties in this proceeding sought to persuade the agency to accept its interpretation of the Love Field Amendment and reject the construction advanced by its adversary. Continental (successfully) urged DOT to read the statute to allow its Love Field-Houston operations, whereas those interested in keeping Love Field down on the farm, so to speak, pressed DOT to give full effect to what they see as Congress' broadly exclusionary intent.
 
 
 27
 With the agency's interpretive task at an end, we are now called upon to measure the results of its handiwork by the Chevron yardstick of "reasonableness." In our view, reasonableness in this context is to be determined by reference both to the agency's textual analysis (broadly defined, including where appropriate resort to legislative history) and to the compatibility of that interpretation with the Congressional purposes informing the measure. The latter aspect of the reasonableness inquiry, for reasons that we shall presently state, is the more difficult and sensitive half of our Chevron Step Two exercise.
 
 Textual Analysis
 
 28
 By definition, analysis under the rubric of Chevron 's second step means that Congress' specific intent on the question at hand has eluded the reviewing court. The court, having employed the traditional tools of statutory construction, has been unable to discern Congress' intent on the issue to be resolved. Our shorthand way of describing the results of the first step of the Chevron inquiry is that the statute is, in pertinent part, ambiguous.[4]
 
 
 29
 Ambiguity in the statute almost inevitably (if indeed not always) suggests that the statute may permissibly be read in more than one manner. In this instance, the agency's reading is, for reasons we have already adumbrated, the more natural of the competing interpretations pressed upon us. It goes without saying that to find that the agency has embraced the more natural reading of a statute means that the agency's interpretation passes muster under this subpart of the Step Two inquiry.
 
 Compatibility with Congressional Purposes
 
 30
 This brings us to the difficult part of the Chevron Step Two analysis, namely whether the agency's interpretation is compatible with Congress' purposes informing the measure. This aspect of the judicial exercise is inherently difficult because legislation is so frequently the product of compromise and accommodation. All 535 members of the two Houses may be keenly interested in, say, clean air or clean water. But broad consensus on noble objectives represents only the beginning of the legislative process. The very idea of a multi-member (and bicameral) legislative body is to provide a place for debate, deliberation and, ultimately, decision. Interests have to be considered. Judgments have to be made. And in the process, tradeoffs inevitably abound. That is what the legislative process is all about. See, e.g., Board of Governors v. Dimension Financial Corp., 474 U.S. 361, 373-74, 106 S.Ct. 681, 688, 88 L.Ed.2d 691 (1986).
 
 
 31
 Judicial seizing upon a single Congressional goal and transmogrifying that desire into the measuring rod against which to measure agency fidelity to supposed legislative norms poses obvious anti-democratic dangers. In plain English, it may distort the legislative process. The upshot of "purpose-driven" interpretive methodologies is that carefully wrought compromises on Capitol Hill may be torn asunder in federal courthouses. Losers in the Congress (or more precisely, partial winners who may view themselves as losers) may find themselves ultimate victors by eschewing the democratic process and instead entering the litigation arena. The backdrop of Chevron itself is illustrative. There, in administering the Clean Air Act, the agency (EPA) had permitted regulated industry the benefit of a flexible measure known as the bubble concept, to the understandable chagrin of various environmental groups. Congress, the appellate court correctly found, had not spoken to the question at hand. This led the lower court to focus on the overarching Congressional purpose of the statute in question. The Supreme Court disapprovingly described the resulting interpretive approach in the following way:
 
 
 32
 In light of its conclusion that the legislative history bearing on the question was "at best contradictory," [the court] reasoned that "the purposes of the nonattainment program should guide our decision here." ... Since the purpose of the permit program--its "raison d'etre" in the court's view--was to improve air quality, the court held that the bubble concept was inapplicable in these cases.... It therefore set aside the regulations embodying the bubble concept as contrary to law.
 
 
 33
 467 U.S. at 841-842, 104 S.Ct. at 2781 (citations omitted). This approach, the Court concluded, did violence to the elaborate, if untidy, process of legislation. In the process of canvassing the intricate history of the pertinent iterations of the Clean Air Act and its amendments, Justice Stevens, in writing for the Chevron Court, made the following observation:
 
 
 34
 As always in this area, the legislative struggle was basically between interests seeking strict schemes to reduce pollution rapidly to eliminate its social costs and interests advancing the economic concern that strict schemes would retard industrial development with attendant social costs.
 
 
 35
 Id. at 847, 104 S.Ct. at 2784. Compromise, in short, is the stuff of legislation. Easy resort by the judiciary to the "broad purpose" of the National Legislature almost invariably will suffer from the related evils of substantially expanding judicial running room in the interpretation of statutes and promoting revisionist alterations of the final results of the legislative process. A unanimous Supreme Court put it this way just a few years ago in the non-bank bank case:
 
 
 36
 Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises.
 
 
 37
 Board of Governors v. Dimension Financial Corp., supra, 474 U.S. at 373-74, 106 S.Ct. at 689.
 
 
 38
 To be sure, we are faced in the precincts of Chevron Step Two analysis with ambiguous legislative materials, not the clarity of statutory expression found by the Court in Dimension Financial. But the anti-democratic danger still exists, especially since ambiguity may well be the deliberate result of competing and warring legislative forces striving to achieve essentially incompatible results in a single piece of legislation (or simply to minimize "losses"). It therefore will not do, when interpreting a statute embodying conflicting demands, for courts grandly to resort to a single "broad purpose" of a statute and then employ a judicially idealized "goal" to drive the interpretive process. To do so may represent not only revisionist interpretations of a specific legislative measure but, as if more were needed, it portends a judicial supplanting of a key actor in the drama, namely the agency itself, present on stage at Congress' express direction.
 
 
 39
 As a result, we are persuaded that the "compatibility with Congressional purposes" prong of Chevron analysis must be carried out with assiduous care for the concerns articulated in Chevron and Dimension Financial about judicial unwinding of deals struck in Congress. This means, more specifically, that precision of goal identification must be the order of the day. It will not do to say, for example, that Congress wanted to protect DFW and cabin Love Field, and thus whatever interpretation best serves that overarching "goal" must be embraced. Rather, the goal (or more precisely, the competing and conflicting goals) must be identified with care and respect for the compromise-laden legislative process.
 
 
 40
 Indeed, a careful reading of Chevron makes clear that courts are not to be in the business of searching for the interpretive approach that "best promotes" the legislative "purpose" in question. That process, Chevron makes clear, results in a subtle transformation of the judicial role into an agency role. By virtue of well-known institutional limitations, the generalist judiciary is singularly ill-equipped to decide what best promotes Congressional "purposes" in the inevitably complex world of regulation. In the garden-variety area of arbitrary-and-capricious style review, the judiciary is never to engage in that sort of enterprise. Our Overton Park-Airbags ordained mission is, rather, to determine whether the agency engaged in reasoned decisionmaking, which over the years has come to mean a variety of well-known factors almost in the nature of a checklist. A moment's reflection suggests that those familiar factors, such as "consideration of meaningful alternatives," "a reasoned explication of the choice made," "demonstrating a reasonable connection between the facts found and the option selected," and the like, are all in the nature of reasonableness-checking. If carried out correctly, arbitrary-and-capricious style review does not put the court into the (agency's) driver's seat. It is, rather, for the agency to decide the exact trade-off among conflicting goals that "best promotes" the Congressional "goal" in question. That is the essence of policymaking. And if one thing should be clear, it is that courts are not to engage (at least in the arena of judicial review of agency action) in substantive policymaking. That would be but another species of what a unanimous Supreme Court roundly condemned in Vermont Yankee as "judicial intervention run riot." Vermont Yankee Nuclear Corp. v. Natural Resources Defense Council, 435 U.S. 519, 557, 98 S.Ct. 1197, 1218, 55 L.Ed.2d 460 (1978). Justice Stevens reiterated this point at some length in Chevron. Here is one part of what the Court, speaking through him, had to say:
 
 
 41
 The arguments over policy that are advanced in the parties' briefs create the impression that respondents are now waging in a judicial forum a specific policy battle which they ultimately lost in the agency and in the 32 jurisdictions opting for the bubble concept, but one which was never waged in the Congress. Such policy arguments are more properly addressed to legislators or administrators, not to judges.
 
 
 42
 Chevron, 467 U.S. at 864, 104 S.Ct. at 2792 (footnote omitted).
 
 
 43
 If policymaking (in the guise of "best promotes"-style analysis) is forbidden, what polestar is to guide judicial inquiry under this branch of Chevron ? In our view, the critical point is whether the agency has advanced what the Chevron Court called "a reasonable explanation for its conclusion that the regulations serve the ... objectives [in question]." Id. at 863, 104 S.Ct. at 2792. This, of course, sounds closely akin to plain vanilla arbitrary-and-capricious style review. But it should immediately be made clear that interpreting a statute is quite a different enterprise than policymaking, especially as embodied in rules that have the force of law. See, e.g., Pacific Gas & Electric Co. v. FPC, 506 F.2d 33, 38 (D.C.Cir.1974). Fundamental differences under the APA turn on that distinction, and the agency is engaged in an analytically distinct function to the extent that it is engaging in an interpretation of the statute, as opposed to "legislating" pursuant to power delegated by the Article I branch.[5] In short, much of the "arbitrary and capricious" style analysis concerned with reasoned agency decisionmaking that is articulated in the Overton Park and Airbags line of cases cannot be applied directly to the question of whether an agency's interpretation of a statute is "contrary to law." It would be inappropriate, therefore, to import wholesale that body of law and apply it in a conceptually distinct arena. The applicable strain from the Overton Park mode of analysis is, again, the one we see in the Supreme Court's words in Chevron. They bear repeating: The agency is to provide "a reasonable explanation for its conclusion that [the interpretation] serve[s] the [statutory] objectives." Chevron, 467 U.S. at 863, 104 S.Ct. at 2792. This is the essence of this court's holding (immediately in Chevron 's wake) in Rettig v. Pension Benefit Guaranty Corp., 744 F.2d 133 (D.C.Cir.1984), which we shall describe presently.
 
 
 44
 "Reasonableness" in this context means, we are persuaded, the compatibility of the agency's interpretation with the policy goals (as carefully identified in the manner previously described) or objectives of Congress. To say, however, that the agency's interpretation must be "compatible" with Congressional purposes is, again, not to say that the agency must identify a single, overarching statutory purpose and strive to interpret the statute in such a way that best promotes that purpose. To state the obvious, "compatibility" is a considerably less exacting standard. The distinction was well captured, we think, in Rettig. There, the court observed that the agency's interpretation of its organic statute (PBGC's interpretation of ERISA) was "not particularly compelling" but at the same time it was "not patently inconsistent with the statutory scheme." 744 F.2d at 152. This formulation strikes a harmonious chord with the Supreme Court's teaching in the frequently cited pre-Chevron case of Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981). There, the Court observed that an agency interpretation did not merit judicial approbation if it actually frustrated the policies that Congress was seeking to effectuate. Here are the words of Justice White, speaking for the Court in that case:
 
 
 45
 [Courts] must reject administrative constructions of the statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement.
 
 
 46
 Id. at 32, 102 S.Ct. at 42. To repeat, for sake of clarity: A judicial decision to the effect that an agency's interpretation frustrates the policies of Congress (or is inconsistent with the statutory mandate) is a far cry from a decision that the agency's approach fails best to promote Congress' purposes.
 
 
 47
 With these principles in mind, we need not tarry long in assaying whether the Department's interpretation of the Love Field Amendment is compatible with Congressional purposes. We think it clearly is. As the Department explained in some detail, the purpose of the Love Field Amendment was to limit that airport's operations to "short haul" service. Permitting Continental to provide Love Field-Houston service was, obviously, entirely in keeping with that policy. Indeed, Continental is not availing itself of the full sweep of the Love Field Amendment, which by its terms permits a carrier serving that airport to fly from Love Field to points in any of the four contiguous States outside Texas. There is certainly nothing to suggest, as Rettig put it, that DOT's interpretation is "patently inconsistent with the statutory scheme." 744 F.2d at 152.
 
 
 48
 In so concluding, we find ourselves in fundamental disagreement with the suggestion advanced by the DFW parties that rejection of the Department's "plain meaning" conclusion sounds the death knell for any deference whatever to the agency's interpretation. In one sense, this provocative argument is beside the point. As our prior discussion suggests, left to our own interpretive lights, we would find the agency's construction of the statute to be (1) the more natural reading, and (2) fully compatible with Congress' purpose. These conclusions would, of course, suffice to decide the case in exactly the same way, namely that Continental (and DOT) wins.
 
 
 49
 But our analysis heretofore has been conducted under the rubric of the two-step approach mandated by Chevron. To restate the obvious, that framework for analysis requires deference to reasonable agency interpretations of ambiguous statutes. We must therefore, in fairness, tackle the DFW parties' contention head on.
 
 
 50
 For the following reasons, we are convinced that the argument fails. Preliminarily, we note that to find ambiguity in the statute is not to say that the agency's proffered plain-meaning interpretation is entirely without merit. This is after all, not a Chenery question (prohibiting courts from upholding substantive agency actions on grounds other than those advanced by the agency); it is, rather, an interpretive exercise.[6] And, as we have already indicated at some length, the agency's proposed reading of the statute strikes us as the more natural and defensible interpretation, even though it does not carry the day under the banner of "plain meaning."
 
 
 51
 More fundamentally, however, it is elementary in administrative law that, at least where Congress' intent is unknown, an agency's interpretation (if reasonable) is entitled to deference from the Article III branch. This notion is premised on the very nature of our system of government, with its time-tested separation of governmental powers. Judicial deference is, after all, but a short-hand way of saying that the judiciary is duty bound to respect the original choice of the political branches in vesting authority in an agency to interpret and enforce a statute. To depart from the culture of deference (again, as always, where Congress' specific intent on the question at hand is unclear) is to do violence to basic structural principles relied upon by Congress and the President in creating the agency in the first instance and endowing it with powers to interpret, administer and enforce that portion of the law of the land.
 
 
 52
 Indeed, the DFW parties' position would work an ironic, if not perverse, result. Under their approach, deference would be denied to the agency in those very situations in which (although the agency had contended otherwise) Congress' intent was unclear. Yet deference to the agency is triggered only when the statute is unclear, since it is common ground that court and agency alike are bound to respect and obey Congress' intent. The contrary approach championed by the DFW parties obviously turns pro tanto Chevron (and fundamental principles of administrative law) on its head.
 
 III
 
 53
 Southwest, not joined by the DFW parties on this issue, also claims that DOT erred in its interpretation of the commuter airline exception, embodied in section 29(a) of the Amendment, see supra note 1. That subclause provides an exception to the prohibition of interstate flights out of Love Field for "air transportation provided by commuter airlines operating aircraft with a passenger capacity of 56 passengers or less."
 
 
 54
 The parties' disagreement hinges on whether the phrase "operating aircraft with a passenger capacity of 56 passengers or less" is to be read as a restrictive or nonrestrictive clause. Southwest reads the clause restrictively to establish two separate limitations: Only commuter airlines may take advantage of this exception, and among this class of airlines, only those operating aircraft with a passenger capacity of 56 passengers or less fall within the exception.
 
 
 55
 DOT reads the critical phrase as a nonrestrictive clause. The language merely gives definition to the term "commuter airlines." DOT reasons that because the term "commuter airline" is not defined elsewhere in the Amendment, "[t]he Amendment's language must ... stand on its own." J.A. at 16. Moreover, DOT observes, this interpretation is consistent with other restrictions in the Love Field Amendment because the range of aircraft with such small passenger capacity is limited and thus the exception will not undermine Love Field's status as a short-haul service airport. Id.
 
 
 56
 The language of the provision is, we are persuaded, ambiguous; neither the text of the provision nor the legislative history provides a reason to prefer one grammatical analysis over the other. We are thus in the area of Chevron Step Two analysis. Southwest essentially makes two arguments in favor of its interpretation. First, Southwest maintains that Congress meant to define the term "commuter airlines" by reference to existing CAB regulations. Under those regulations, Southwest argues, "[a] 'commuter airline' ... was commonly understood to be an uncertificated carrier which operates only small aircraft, but under a published schedule." Southwest Brief at 47. Second, Southwest argues that DOT's interpretation leaves a gaping loophole in the statutory scheme because it allows large airlines to use small aircraft as "feeders" for interstate operations.
 
 
 57
 We disagree. First, Congress might have defined "commuter airlines" with greater specificity by explicitly incorporating definitional references to agency regulations, but it chose not to do so. We cannot say that Congress meant to incorporate those regulatory definitions absent indications of its intention to do so in the statute or the legislative history. Second, as DOT points out, DOT's interpretation is consistent with the purpose of the Amendment to limit Love Field to short-haul service. See supra p. 1453. We cannot say, therefore, that the agency's interpretation would frustrate the policies Congress embraced in enacting the Love Field Amendment or is "patently inconsistent" with the statutory mandate. We conclude that DOT's interpretation in this respect is reasonable within the meaning of Chevron Step Two.
 
 IV
 
 58
 Although supportive of the Department's interpretation of the entry provisions of the Love Field Amendment, Continental assails DOT's conclusion that it could not advertise a specific service (called "double ticketing") or list double ticketed connecting flights in its schedules. Double ticketing, as succinctly described by the Department, "involves the purchase by a passenger of two separate tickets: one for service from Love Field to a point within Texas or the four adjacent states (Love Field Service Area), and a separate, second ticket for service from that destination to a point beyond the authorized Love Field Service Area." DOT Brief at 48 n. 34. Double ticketed passengers are subject to several pesky inconveniences, including separate fares and the need to reclaim any checked baggage at the connecting point and then recheck it on the next flight. Id.
 
 
 59
 In the proceeding before the agency, Continental requested DOT to clarify certain issues relating to the sale and advertising of double ticketed service. In response, DOT concluded that double ticketing practices were lawful, but that advertising of the service was impermissible. In response to the Department's conclusion, Continental filed a separate petition for review, challenging this portion of the order as violative of First Amendment protections for commercial speech. In Continental's view, the broad prohibition on the advertising of a lawful service cannot pass muster under the four-pronged analysis of the Supreme Court in Central Hudson Gas and Electric Co. v. New York, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), as further articulated by the Court's subsequent decision in Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico, 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986).
 
 
 60
 DOT interposes a threshold objection to Continental's constitutional attack, namely that the airline failed to articulate its objection before the Department. This failing, DOT argues, triggers section 1006(e) of the Federal Aviation Act of 1958, 49 U.S.C. Sec. 1486(e) (1982), which codifies the familiar requirement of exhaustion of administrative remedies. Section 1006(e) provides:
 
 
 61
 No objection to an order of the Board or Secretary of Transportation shall be considered by the court unless such objection shall have been urged before the Board or Secretary of Transportation or if it was not so urged, unless there are reasonable grounds for failure to do so.
 
 
 62
 The parties are in accord that Continental was mum before the agency on the constitutional issue. Accord abruptly ends at that point, however, as Continental and DOT are in deep disagreement as to whether the objection, by virtue of its constitutional nature, was required to have been pressed before the agency. Continental urges that its objection represents a substantive constitutional challenge to the statute itself, and thus falls within a well-established exception to the exhaustion requirement. See, e.g., Weinberger v. Salfi, 422 U.S. 749, 765-66, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975); Johnson v. Robison, 415 U.S. 361, 368, 94 S.Ct. 1160, 1166, 39 L.Ed.2d 389 (1974). DOT counters that, had Continental raised its objections below, "the Department would have had the opportunity to decide the Constitutional aspects of the advertising question, perhaps in a way that might have eliminated the need to bring the Constitutional question before this Court." DOT Brief at 51.
 
 
 63
 We agree with the Department. Fairly viewed, the airline's objection is not one based on the statute itself. Rather, the objection is to the Department's expansive interpretation of the statute.[7] The distinction is of critical importance, for it cannot be gainsaid that, in carrying on its interpretive function, an agency must be mindful of the higher demands of the Constitution. To be sure, the Department is powerless to determine the constitutionality of the statute itself, as the Supreme Court plainly held in Weinberger v. Salfi, 422 U.S. at 765, 95 S.Ct. at 2466. See also Meredith Corp. v. FCC, 809 F.2d 863 (D.C.Cir.1987). But it is a commonplace that agencies modify or even reverse their views on the meaning of a statute. At times, the agency's new interpretive path is undertaken only after years of traveling in a different direction.
 
 
 64
 Here, Continental chose not to favor DOT with even a whimper to the effect that a broad advertising ban could work a constitutional violation. This of course strikes at the heart of exhaustion values codified by Congress in the Aviation Act. As we see it, the agency was never given a shot at wrestling with the statute in a way that, in the agency's view, would comport with the demands of the First Amendment (or, more precisely, meet Continental's stated objectives).
 
 
 65
 We hasten to acknowledge that, at oral argument, counsel for DOT virtually suggested that it would in all likelihood be futile for Continental to press its objections before the agency. Anxious to avoid any petitions for rulemaking (or a petition for clarification or whatever might be an appropriate procedural vehicle in agency practice), counsel opined that he could not envision a different view of the statute than that already embraced by the Department. Needless to say, this bold representation added fuel to the fires skillfully stoked by Continental, which falls back to the position that even if the exhaustion requirement arguably obtained, it would have been futile to press the point. Although counsel's burst of candor in the heat of colloquy is admirable in one respect, we are, upon reflection, satisfied that our acceptance of his implicit invitation to throw up our hands and find "futility" would work a violation of basic notions of administrative law and practice. Counsel was, after all, speaking only as counsel, not as the agency itself. And in a more sober moment, the agency (albeit through counsel) did suggest the possibility of narrowing regulations had Continental pressed the point in a timely manner:
 
 
 66
 It is for the first time in this Court that Continental proposes regulations concerning the advertising of double ticketed connections, such as publication of information on the legality and practical limitations of, and procedures for, double ticketed connection. However, development of such detailed regulations is normally the province of the administrative agency, not the reviewing court.
 
 
 67
 DOT Brief at 52.
 
 
 68
 Just so. We think Continental's creative, but belated, recommendation of less sweeping regulations ineluctably suggests that the agency might, had the point been raised, taken such possibilities into account in the interpretive process. But we can never know. Under these circumstances, we believe that the Congressionally ordained requirement of exhaustion fully obtains.
 
 
 69
 Denied.
 
 
 
 *
 This case was originally argued before a panel comprised of Circuit Judges Starr and Silberman and Senior Judge McGowan. After Senior Judge McGowan's death, the case was reargued before a reconstituted panel comprised of Circuit Judges Starr, Silberman, and Williams
 
 
 [1]
 (a) Except as provided in subsection (c), notwithstanding any other provision of law, neither the Secretary of Transportation, the Civil Aeronautics Board, nor any other officer or employee of the United States shall issue, reissue, amend, revise, or otherwise modify (either by action or inaction) any certificate or other authority to permit or otherwise authorize any person to provide the transportation of individuals, by air, as a common carrier for compensation or hire between Love Field, Texas, and one or more points outside the State of Texas, except (1) charter air transportation not to exceed ten flights per month, and (2) air transportation provided by commuter airlines operating aircraft with a passenger capacity of 56 passengers or less
 (b) Except as provided in subsections (a) and (c), notwithstanding any other provision of law, or any certificate or other authority heretofore or hereafter issued thereunder, no person shall provide or offer to provide the transportation of individuals, by air, for compensation or hire as a common carrier between Love Field, Texas, and one or more points outside the State of Texas, except that a person providing service to a point outside of Texas from Love Field on November 1, 1979, may continue to provide service to such point.
 
 
 [2]
 [N]o air carrier that provides any through service or ticketing with another carrier or foreign air carrier may be authorized to operate interstate air service from Love Field
 H.R.Rep. No. 96-716, 96th Cong., 1st Sess. 25 (1979), partially reprinted in [1980] U.S.Code Cong. & Ad.News 78, 87, J.A. at 20.
 
 
 [3]
 It should go without saying that post-enactment legislative history is singularly unavailing in the sensitive process of diving meaning. Whatever the merits of legislative history as a general matter, see, e.g., Burlington Northern Railroad Co. v. Oklahoma Tax Comm'n, --- U.S. ----, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) ("[u]nless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete"), it is common ground that post-enactment statements by Members of Congress, even highly knowledgeable ones, will not do service
 
 
 [4]
 There are a few buoys in Chevron 's harbor helpfully pointing the way. For example, Congress can reasonably be expected to be quite precise in defining critical jurisdictional terms going to the very power of the agency to regulate. See, e.g., ACLU v. FCC, 823 F.2d 1554, 1567 n. 32 (D.C.Cir.1987); American Mining Congress v. EPA, 824 F.2d 1177, 1186-87 (D.C.Cir.1987)
 
 
 [5]
 In some situations, the review may in fact partake of both an interpretive and a rulemaking function. This was the case in Rettig v. Pension Benefit Guarantee Corp., 744 F.2d 133, 150-55 (D.C.Cir.1984), discussed in the text. Moreover, agency action may embody both an interpretation of the statute and a legislative (or substantive) "rule" based on that interpretation. See, e.g., American Fed'n of Labor and Congress of Industrial Organizations v. Donovan, 757 F.2d 330 (D.C.Cir.1985). We are here, of course, focusing on the interpretive function, not the delegated lawmaking function that agencies also perform
 
 
 [6]
 This case is thus unlike Prill v. National Labor Relations Board, 755 F.2d 941 (D.C.Cir.), cert. denied, 474 U.S. 948, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985). In that case, we remanded to the agency upon finding that the Board had erred both in its interpretation of the statute at issue in the case and in its determination that it was without discretion to interpret the statute in any manner other than the way in which it had done. Id. at 948; see also Prill v. National Labor Relations Board, 835 F.2d 1481, 1482 (D.C.Cir.1987) (reviewing the case for a second time after remand to the agency)
 
 
 [7]
 DOT reasoned that by using the word "offer" in the Amendment, along with references to "holding out" in the legislative history, "[t]he language of the Amendment makes clear that a carrier cannot advertise, promote, or otherwise affirmatively solicit double-ticketing passengers." J.A. at 14. Nevertheless, the statute does not, in so many words, prescribe an advertising ban. Apart from the constitutional issue, we of course express no opinion with respect to whether DOT's interpretation is compelled by the statute